F I L E D
United States Court of Appeals
Tenth Circuit

JUN 25 2003

PATRICK FISHER
Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellant,

v.

RONALD GLENN GARNER and
KENNETH RICARDO THOMPSON,

      Defendants-Appellees.

No. 02-5098
(D.C. No. 02-CR-60-H)
(Northern District of Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and
**ANDERSON**, Senior Circuit Judge.

Pursuant to 18 U.S.C. § 3731, the government filed an interlocutory appeal from

an order of the district court granting the defendants' motions to suppress. Initially, there

was some concern on the part of this Court as to whether the government had made a

certification that the appeal was not being taken for purposes of delay and that the

evidence suppressed was substantial proof of a fact which was material to the proceeding,

as is required by 18 U.S.C. § 3731. Accordingly, an order to show cause was issued by

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

this Court, *sua sponte*. It now appears from the showing made in response to our show cause order, that there was proper certification. Accordingly, the parties, and this Court, now agree that there has been compliance with 18 U.S.C. § 3731 and that we have jurisdiction over this case. *United States v. Carillo-Bernal,* 58 F.3d 1490, (10th Cir. 1995); *United States v. Hanks,* 24 F.3d 1235 (10th Cir. 1994). In this regard, we now grant the Appellant's motion to amend the docketing statement.

On March 31, 2002, Trooper David King ("the trooper"), an Oklahoma State Highway Patrol Trooper, stopped the driver of a Chevrolet pickup truck because he was making lane changes without signaling at a turnpike toll plaza on an eastbound lane of Interstate 44. As the trooper approached the driver's window of the pickup truck, he told the driver, Ronald Glenn Garner ("Garner"), that he had been stopped for failure to use his turn signal. The trooper then asked Garner to get out of his pickup truck and to produce his driver's license and vehicle registration. Garner produced a California driver's license but he had no vehicle registration. He did produce some title documents purporting to show that he had recently purchased the vehicle. The papers thus produced seemed "unusual" in several respects to the trooper, and he testified at the suppression hearing that Garner had a "hard time" telling him where, or under what circumstances, he had purchased the car.[1] The pickup was registered to a "Martinez." Also, when Garner

---

[1]At the hearing on the motion to suppress, the trooper was the only witness. He was examined at length by counsel for the government and by counsel for Garner and Thompson, as well as by the district court. A video of this entire transaction, including

- 2 -

produced his driver's license "his hand was shaking." When exiting his pickup, Garner

informed the trooper that his cousin, Kenneth Thompson ("Thompson"), was asleep in the

back of his vehicle under a camper shell. The trooper then asked Garner to sit beside him

in the passenger seat of the patrol car. Once there, the trooper again told Garner why he

had been stopped and that he was going to issue him a warning citation.

While the trooper was filling in the information on the warning citation and was

waiting for returns on his computer check, he asked Garner where he had come from and

where he was going. The trooper testified that Garner "had a hard time answering."

However, in response to such inquiries, Garner said he was traveling from California to

Indianapolis at his own expense because he was employed in both places. Garner stated

that he was traveling with his cousin Thompson, so that the latter could help him drive

and that, after reaching Indianapolis, they would stay there for a couple of weeks and

return to California. The trooper testified that at about that point in time he began to have

a "suspicion."

The trooper then decided to talk to Thompson (the passenger) and see if he had a

valid driver's license. The trooper left the patrol car and made contact with Thompson,

who was still in the rear of the pickup truck under a camper shell. Thompson informed

the trooper that he did have a driver's license and came out of the rear window of the

---

conduct and conversation, was introduced in the district court, and is a part of the record
on appeal.

- 3 -

camper shell. The trooper thereafter questioned Thompson about the reason for the trip and Thompson said "he was headed to Cincinnati to play paint ball and visit family." The trooper then returned to his patrol car and "ran a driver's license and status check on both individuals," and determined that both of them had valid licenses and that there were no outstanding warrants for either. At this point, the trooper finished writing the warning citation, a copy of which Garner signed, and the trooper then returned to Garner his driver's license and gave him a copy of the warning citation. About 15 minutes elapsed between the stop of Garner's pickup and the time that the trooper finished writing the warning citation and gave it to Garner. Then, just as Garner was about to exit the patrol car, the trooper asked if Garner had a moment to answer a few questions before he left, to which Garner said "Okay." The trooper then asked Garner if he had any weapons or contraband in the truck, to which Garner replied "no." The trooper next asked Garner if he could search the vehicle, and Garner consented thereto.

The trooper then got out of his patrol car, proceeded to the passenger side of the patrol car and searched Garner and Thompson for possible weapons. None were found on either. The trooper had both Garner and Thompson sit in the patrol car while he searched the pickup. The trooper ran his narcotics-sniffing dog around the truck and the dog "alerted to the tailgate area." By that time another trooper, a Mr. Cason, had arrived at the scene. The troopers then searched the vehicle and, while searching the under carriage, the trooper noticed two or three "fresh welds" in the bottom of the bed of the

- 4 -

pickup. Continuing their search, the troopers found a blue sleeping bag that contained five cellophane packages that field tested for cocaine. Both Garner and Thompson were then arrested.

On April 2, 2002, an indictment was filed in the United States District Court for the Northern District of Oklahoma, charging both Garner and Thompson with possession with an intent to distribute 15 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), 18 U.S.C. § 2(a). They each pled not guilty. Thereafter, the defendants, with separate counsel, filed separate motions to suppress, which the district court, after hearing, granted on July 8, 2002. The government now appeals the district court's suppression order under 18 U.S.C. § 3731. We reverse.

In its order granting the defendants' motions to suppress, the district court first held that the trooper had "probable cause sufficient to stop the defendants . . . ," and that the initial "stop" of the defendants' vehicle was lawful. This particular issue is not raised on appeal.

In granting the defendants' motions to suppress, the district court stated that "when the trooper went to question Mr. Thompson regarding his travel plans, the stop had already exceeded the contours permissible under *Hunnicutt,*" commenting that the detention was "investigative" in nature from the very start. *See United States v. Hunnicutt,* 135 F.3d 1345, 1349 (10th Cir. 1998). Based thereon, the district court concluded that the "consent" later given by Garner to answer additional questions from

the trooper was "the fruit of the unlawful detention," which, as indicated, the district court found had occurred <u>before</u> the trooper left the patrol car where he had been questioning Garner and proceeded to the pickup's camper and began questioning Thompson. Thus, the district court did not reach the question of whether Garner's "consent" to answer a few more questions before he left was, itself, voluntary, nor that additional question of whether the consent to search was voluntary. We do not agree with this analysis of the facts. The facts, themselves, are not in dispute, since the trooper was the only witness. We do disagree with the district court's application of the law to those facts.

An officer conducting a routine traffic stop may request a driver's license and vehicle registration. *Hunnicutt,* at 1349. "[Q]uestions relating to a driver's travel plans ordinarily fall within the [legitimate] scope of a traffic stop." *United States v. Williams,* 271 F.3d 1262, 1267 (10th Cir. 2001); *United States v. West,* 219 F.3d 1171, 1176 (10th Cir. 2000); *United States v. Hernandez,* 93 F.3d 1493, 1499 (10th Cir. 1996).[2]

As indicated, the district court held that <u>before</u> the trooper left the patrol car to question Thompson, the passenger, he had improperly "detained" Garner, i.e., the detention was "longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500 (1983). That was the basis for the district court's grant of the defendants' motions to suppress. We see nothing in the record before us to support that

_____

[2] The fact that a defendant is sitting in the front passenger seat of a patrol car does not, without more, make a consent to answer additional questions involuntary. *United States v. Gigley,* 213 F.3d 509, 514 (10th Cir. 2000).

conclusion. The events occurring from the time the trooper approached the stopped car and asked Garner for his driver's license and vehicle registration until the moment the trooper left his patrol car to talk to Thompson do not show unlawful detention, rather, they show a lawful detention. The trooper asked Garner for his driver's license and vehicle registration, the latter of which Garner could not produce, questioned Garner as to how he had acquired the pickup and his travel plans, and ran a computer check on both occupants of the pickup, all of which is permissible under the authorities above cited.

Further, the "detention" occurring after the trooper left the patrol car to question Thompson and the time when the trooper returned to his patrol car and finished writing the warning ticket given Garner was, under the described circumstances, proper and not unlawful. When there are two persons in the stopped vehicle, the officer can legitimately ask questions relating to identity, travel plans and ownership of the vehicle of both the driver and passenger. *United States v. Rivera,* 867 F.2d 1261, 1263 (10th Cir. 1989). Accordingly, the fact that the trooper detained Garner while he questioned Thompson, does not make Garner's detention unlawful. Having determined that the "detention" of the defendants was proper and not unlawful, we need not here decide whether the trooper had "reasonable suspicion" to detain the defendants. The "detention" of Garner and Thompson, from its inception till, according to the trooper, Garner consented to answer "a few more questions," was proper, as being incidental to a lawful "traffic stop," under the

authorities above cited.[3]

Judgment reversed and case remanded to the district court with instructions that the district court vacate its order granting defendants' motions to suppress, further proceedings to be consonant with the views herein expressed.

ENTERED FOR THE COURT

Robert H. McWilliams
Senior Circuit Judge

[3]In an unpublished opinion filed February 18, 2003, we upheld a district court's denial of a defendant's motion to suppress in a case involving facts strikingly similar to those in the instant case. *United States v. Vargas,* 2003 WL 352779 (10th Cir. Feb. 18, 2003).