**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 30, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

GERARDO ALCARAZ-ARELLANO,

        Defendant - Appellant.

.

No. 04-3230

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 03-CR-40015-01-SAC)**

---

Marilyn M. Trubey, Assistant Federal Public Defender (David J. Phillips, Federal Public Defender, with her on the brief), Topeka, Kansas, for the Defendant - Appellant.

James A. Brown, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), Topeka, Kansas, for the Plaintiff - Appellee.

---

Before **HENRY, McKAY,** and **HARTZ,** Circuit Judges.

---

**HARTZ** , Circuit Judge.

---

On February 11, 2003, Gerardo Alcaraz-Arellano was indicted in the United States District Court for the District of Kansas on one count of possessing with intent to distribute three kilograms of cocaine and one count of possessing with intent to distribute one kilogram of heroin. *See* 21 U.S.C. § 841(a)(1). He pleaded guilty to the second count. Before pleading guilty he had moved to suppress evidence seized during a vehicle search after a traffic stop and, alleging selective enforcement (racial profiling), had moved to dismiss the indictment. The district court denied both motions. Mr. Alcaraz-Arellano's plea agreement preserved his right to appeal the district court's rulings on the motions, and he now appeals those rulings. Mr. Alcaraz-Arellano's opening brief also raised a challenge to his sentence, but he later filed a pleading with this court abandoning the challenge. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

I.      **MOTION TO SUPPRESS**

A.      **Background**

On February 9, 2003, Russell County Sheriff's Deputy Kelly Schneider, who was driving westbound on I-70, determined by radar that Mr. Alcaraz-Arellano, who was driving eastbound, was driving 77 mph in a 70 mph zone. Deputy Schneider turned around to pursue Mr. Alcaraz-Arellano's car, a gold 2001 Oldsmobile Alero. He pulled alongside the car and observed two men inside, both of whom appeared to be Hispanic. He then directed Mr. Alcaraz-

Arellano to stop. Mr. Alcaraz-Arellano brought his car to the side of the highway at 2:42:20 p.m. The stop was recorded by a videorecorder inside Deputy Schneider's patrol car.

Deputy Schneider exited his car, stood behind Mr. Alcaraz-Arellano's car, and signaled to Mr. Alcaraz-Arellano to come to him. Mr. Alcaraz-Arellano complied. When Deputy Schneider asked for his license, Mr. Alcaraz-Arellano retrieved his license from his car and gave it to Deputy Schneider. Deputy Schneider then asked for Mr. Alcaraz-Arellano's registration, and Mr. Alcaraz-Arellano again returned to his car, obtained the registration, and gave it to him. Deputy Schneider examined the documents, which showed that Mr. Alcaraz-Arellano was licensed to drive in New York and had purchased the car in California three days earlier. The address for Mr. Alcaraz-Arellano on the registration was in California. In response to Deputy Schneider's questions, Mr. Alcaraz-Arellano said that he lived in New York, had traveled to California, had stayed there one and one-half days, had purchased the car, and was en route back to New York. Deputy Schneider observed that Mr. Alcaraz-Arellano appeared extremely nervous.

At 2:44:30 p.m. Deputy Schneider returned to his patrol car. At 2:45:09 he invited Mr. Alcaraz-Arellano into the patrol car, telling him, "let's get you where it's warm." Deputy Schneider then informed Mr. Alcaraz-Arellano that he was

writing him a warning, which would not cost him any money. While he was writing the warning ticket, Deputy Schneider asked Mr. Alcaraz-Arellano when he had bought the car and what he did for a living. Mr. Alcaraz-Arellano told Deputy Schneider, among other things, that he worked in landscaping, but had not worked for two months.

At 2:46:38 p.m. Deputy Schneider radioed the dispatch operator to verify Mr. Alcaraz-Arellano's license. The operator responded with the license information at 2:52:06 p.m. During that interval Deputy Schneider continued questioning Mr. Alacaraz-Arellano, asking whether he liked his car, whether there was much snow in New York, who his passenger was, where his passenger lived, what he typically did during the winter since he had not worked for a couple months, whether he owned the car, and how much he paid for it. Mr. Alcaraz-Arellano said that he had bought the car for $4,000.

Deputy Schneider gave Mr. Alcaraz-Arellano the warning ticket and bid him "adios" at 2:52:44 p.m., 10 minutes after the stop. But as Mr. Alcaraz-Arellano was leaving the patrol car, Deputy Schneider requested permission to ask a few more questions. Mr. Alcaraz-Arellano agreed. Deputy Schneider asked whether he had any contraband in the car. Mr. Alcaraz-Arellano replied that he did not. Deputy Schneider asked to "look in" the car, and Mr. Alcaraz-Arellano consented.

While inspecting the trunk, Deputy Schneider noticed that its floor was green rather than gold, whereas, to his knowledge, the original undercoating almost always matches the exterior paint. He also noticed that the caulking around the floor was new, thick, and white, and that the carpet padding in the spare-tire compartment was glued to the floor, whereas in most cars the carpet padding can simply be pulled away from the floor. He then conducted a "finger test" inside the trunk, placing one hand on the inside of the trunk and one hand underneath the car, and tapping on the trunk to listen for signs of a gap between the top and the bottom. He concluded that there was such a gap and estimated it to be about three inches, indicating a concealed compartment. He told Mr. Alcaraz-Arellano that he had found a false compartment, and that he would take the car to the sheriff's department to be searched. The subsequent search revealed a hidden compartment containing three kilograms of cocaine and one kilogram of heroin.

Mr. Alcaraz-Arellano filed a motion to suppress the evidence seized during the search of his car, arguing that the traffic stop itself was illegal because he was not speeding, that Deputy Schneider's subsequent detention of him was illegal because its scope and duration exceeded what was justified by the purpose of the stop, and that Deputy Schneider did not have reasonable suspicion of criminal activity to justify the questioning during the stop. In denying Mr. Alcaraz-

Arellano's motion to suppress evidence, the district court ruled that Deputy Schneider's stop of Mr. Alcaraz-Arellano was valid because he had reasonable suspicion that Mr. Alcaraz-Arellano was speeding, that Deputy Schneider's further detention and questioning of Mr. Alcaraz-Arellano was justified by reasonable suspicion, and that Mr. Alcaraz-Arellano gave valid consent for Deputy Schneider to search his car.

On appeal Mr. Alcaraz-Arellano argues that Deputy Schneider violated the Fourth Amendment by asking him questions unrelated to the initial purpose of the stop; that Deputy Schneider did not have reasonable suspicion to ask these unrelated questions; that he did not validly consent to Deputy Schneider's continued questioning of him after returning his license; that he did not validly consent to Deputy Schneider's search of his car; and that if the search was consensual, Deputy Schneider exceeded the scope of consent.

**B.      Analysis**

Mr. Alcaraz-Arellano argues that Deputy Schneider's detention and questioning of him violated the Fourth Amendment.  The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  A traffic stop is a Fourth Amendment seizure "even though the purpose of the stop is limited and the resulting detention quite brief."  *Delaware v. Prouse*, 440 U.S.

648, 653 (1979). A traffic stop is permissible under the Fourth Amendment if "the officer has a reasonable articulable suspicion that a traffic . . . violation has occurred or is occurring." *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998). "When reviewing a district court's denial of a motion to suppress, we consider the totality of the circumstances and view the evidence in the light most favorable to the government." *U.S. v. Gordon*, 168 F.3d 1222, 1225 (10th Cir. 1999). "We accept the district court's factual findings unless [they] are clearly erroneous." *Id.* "The ultimate determination of reasonableness . . . is a question of law reviewable de novo." *Id.*

Deputy Schneider's initial stop of Mr. Alcaraz-Arellano is not challenged on appeal; he observed (with a radar device) Mr. Alcaraz-Arellano driving 77 mph in a 70 mph zone. Mr. Alcaraz argues, however, that the stop became unlawful when Deputy Schneider asked him questions unrelated to the purpose of the stop. In *United States v. Holt*, 264 F.3d 1215, 1230 (10th Cir. 2001) (en banc), we stated that the reasonableness of a traffic stop depends on both "the length of the detention and the manner in which it is carried out." It is reasonable for an officer to ask questions about the motorist's travel plans and authority to operate the vehicle. *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005). Although *Holt* held that further questioning is justifiable only if it is reasonable in relation to the initial purpose of the traffic stop, *Holt*, 264 F.3d at

1228, the scope of this holding has been limited by the Supreme Court's decision in *Muehler v. Mena*, 544 U.S. 93, 125 S. Ct. 1465 (2005).

In *Muehler* the Supreme Court upheld the police officers' questioning of Ms. Iris Mena, whom they were detaining while they executed a search warrant in the house she occupied; the questioning related to her immigration status, a matter unrelated to the purpose of the search. *Id*. at 1471. The court of appeals had ruled the questioning unconstitutional, apparently on the ground that "the officers were required to have independent reasonable suspicion in order to question Mena . . . because the questioning constituted a discrete Fourth Amendment event." *Id*. The Supreme Court reversed. It stated that "mere police questioning does not constitute a seizure" under the Fourth Amendment. *Id.* (internal quotation marks omitted). "Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage." *Id*. (internal quotation marks and brackets omitted). As Ms. Mena's detention was not prolonged by the questioning, the questioning did not create an additional seizure. *Id*. The Court analogized questioning during a search to performing a dog sniff during a traffic stop, which does not violate the Fourth Amendment if it does not extend the stop "'beyond the time reasonably required to complete [the stop's original purpose].'" *Id*. (quoting *Illinois v. Caballes*, 543

U.S. 405, 125 S. Ct. 834, 837 (2005)). The Court concluded: "[T]he Court of Appeals did not find that the questioning extended the time Mena was detained. Thus no additional Fourth Amendment justification for inquiring about Mena's immigration status was required." *Id.* at 1471-72. In light of *Muehler*, we have held that "[a]s long as the [deputy's] questioning did not extend the length of the detention, . . . there is no Fourth Amendment issue with respect to the content of the questions." *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005).

Applying this law, we first address Deputy Schneider's questioning of Mr. Alcaraz-Arellano before returning his license. This questioning can be divided into three intervals: the initial encounter outside the cars, the time during which Deputy Schneider was writing the warning ticket, and the time while Deputy Schneider was waiting for the dispatch operator to verify Mr. Alcaraz-Arellano's license. During the first interval Deputy Schneider asked only a few questions about travel plans and vehicle ownership before going to his patrol car to issue a warning. Such limited questioning is proper, because an officer may routinely ask about travel plans and ownership during a lawful traffic stop. *See Bradford*, 423 F.3d at 1156.

During the second interval Deputy Schneider questioned Mr. Alcaraz-Arellano in the patrol car while he was writing the warning ticket. This questioning was not limited to travel plans and ownership of the vehicle, but it

-9-

did not appreciably lengthen the detention and therefore the Fourth Amendment requires no justification. *See Wallace*, 429 F.3d at 974. As Mr. Alcaraz-Arellano entered the patrol car, Deputy Schneider told him that he was writing a warning ticket. Deputy Schneider testified at the suppression hearing that he was writing the warning ticket while Mr. Alcaraz-Arellano was in the patrol car. Writing the warning ticket occupied two minutes, one minute and 29 seconds of which was while Mr. Alcaraz-Arellano was sitting in the patrol car. Even if this task might have been performed slightly faster had Deputy Schneider not been asking questions, the time involved was not "beyond the time reasonably required to complete that [task]." *Caballes*, 125 S. Ct. at 837; *see United States v. Martin*, 422 F.3d 597, 601-02 (7th Cir. 2005) ("A traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed."); *United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) (en banc) ("questions that do not increase the length of detention (or that extend it by only a brief time) do not make the custody itself unreasonable"). Therefore, this questioning was lawful.

As for the third interval, the period Deputy Schneider questioned Mr. Alcaraz-Arellano while he was waiting for the radio dispatcher to verify Mr. Alcaraz-Arellano's license (2:46:38 p.m. through 2:52:16 p.m.), the license

check itself was permissible, *see Holt*, 264 F.3d at 1221 ("[D]uring a routine traffic stop the officer may ask to see a driver's license and registration and check that they are valid."), and the questioning did not prolong the detention while the license check was being performed. As a result, the questioning, regardless of the topic, did not violate the Fourth Amendment. In short, we reject Mr. Alcaraz-Arellano's challenges to the questioning before his license was returned.

The questioning after the return of the license, however, must be analyzed differently because it *did* prolong the stop. After Deputy Schneider returned the documentation to Mr. Alcaraz-Arellano and said "adios," he requested permission from Mr. Alcaraz-Arellano to ask a few more questions. Mr. Alcaraz-Arellano agreed and then consented to a search of his car. He contends that this questioning impermissibly extended the traffic stop. We disagree. The additional questioning could be justified if the encounter at this point was consensual, *see United States v. Elliott*, 107 F.3d 810, 814 (10th Cir. 1997), or if prolongation of the stop was supported by reasonable suspicion, *Wallace*, 429 F.3d at 974. Because the district court did not address the possibility of consent, we consider only reasonable suspicion. Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (internal quotation marks omitted). It "represents a 'minimum level of objective justification' which is 'considerably

-11-

less than proof of wrongdoing by a preponderance of the evidence.'" *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989).) In our view, Deputy Schneider possessed reasonable suspicion.

Although the district court ruled that Deputy Schneider had acquired reasonable suspicion to detain Mr. Alcaraz-Arellano for questioning at some point during their conversation in the patrol car, we need address only whether there was reasonable suspicion when Deputy Schneider returned the license to Mr. Alcaraz-Arellano. By that time, Deputy Schneider had the following information: Mr. Alcaraz-Arellano said that he had driven across the country from New York to California for a one-and-a-half-day visit during which he purchased a not-unusual used vehicle for $4,000; he told Deputy Schneider that he lived in New York, but the vehicle registration showed a California address; he was unemployed; and he was extremely nervous. We agree that it was implausible that an unemployed New Yorker would innocently drive to California from New York, visit there for less than two days, purchase a vehicle (giving a California address for the registration), and then drive back. Deputy Schneider thus had reasonable suspicion to detain Mr. Alcaraz-Arellano for further investigation after returning his license and registration . *See United States v. Santos*, 403 F.3d 1120, 1129 (10th Cir. 2005) ("Implausible travel plans can contribute to

reasonable suspicion."); *United States v. McRae*, 81 F.3d 1528, 1534-35 (10th Cir. 1996) (apparent contradiction between dates on defendant's car rental agreement and alleged travel plans contributed to reasonable suspicion); *United States v. Kopp*, 45 F.3d 1450, 1453-54 (10th Cir. 1995) (officer had reasonable suspicion to detain motorist in part because he "did not find it plausible that Defendant would drive from California to North Carolina merely to take a very dilapidated sofa to some friends").

Finally, Mr. Alcaraz-Arellano challenges Deputy Schneider's search of his car. He argues that his consent was invalid because it was the fruit of an unlawful detention. But this argument fails because we have held that the detention was lawful. He also argues that his consent was involuntary. But the record does not indicate that he argued voluntariness in district court, except, perhaps, on the ground that he did not adequately understand English, an argument not raised on appeal. Ordinarily we do not address arguments not made below. *United States v. Moore*, 22 F.3d 241, 243 n.3 (10th Cir. 1994) ("We will not address issues raised for the first time on appeal, on which no adequate record was created below."). That practice is particularly appropriate here, because his failure to raise the argument below deprives us of any fact finding on the matter by the district court. Accordingly, we will not consider the issue of voluntariness.

Mr. Alcaraz-Arellano further argues, however, that even if the consent was

valid, the search was illegal because the scope of his consent was exceeded when the car was transported to the sheriff's department and dismantled. It is not clear whether Mr. Alcaraz-Arellano raised this issue in district court. It appears that all he argued was that he consented only to a mere peek inside, and not to the search conducted while the car was by the side of the highway. But the government does not claim that the issue was not preserved, so we will give Mr. Alcaraz-Arellano the benefit of the doubt and address it.

Mr. Alcaraz-Arellano may be correct that his consent did not extend to transporting the car to the sheriff's department and dismantling it there. But consent was unnecessary because these actions were supported by probable cause. A police officer may conduct a warrantless search of an automobile if there is "probable cause to believe that the vehicle contains contraband or other evidence which is subject to seizure under law." *United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir. 2002) (internal quotation marks omitted). Deputy Schneider discovered in the initial vehicle search that there was probably a concealed compartment in the car. "It is well established that evidence of a hidden compartment can contribute to probable cause to search." *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004) (internal quotation marks omitted). In *Jurado-Vallejo* we held that "[w]hether probable cause to search a vehicle can be based on evidence of a hidden compartment depends on two

factors: (1) the probative value of the evidence—that is, the likelihood that there really is a hidden compartment; and (2) the likelihood that a vehicle with a hidden compartment would, in the circumstances, be secreting contraband." *Id*. Deputy Schneider testified that based on the unexpected color of the car's undercoating (it was green, not gold like the outside of the car); the new thick, white caulking around the floor; the gluing down of the trunk carpet padding; and the observations from his "finger test," he knew from his training and experience that there was a hidden compartment in the car. He also testified that he had found about 50 concealed compartments in vehicles over the course of his career and all but one contained contraband. The district court accepted this testimony. This evidence satisfies both *Jurado-Vallejo* factors in determining probable cause. *See id*. Deputy Schneider's transportation of the car to the sheriff's department and subsequent search was therefore lawful. *See United States v. Zucco*, 71 F.3d 188, 191-92 (5th Cir. 1995) ("If supported by probable cause, every part of a vehicle which may conceal the object of the search may be searched."); *see also Mercado*, 307 F.3d at 1231 (officer's dismantling of the altered ceiling of a van to search hidden compartment was legal because supported by probable cause). Thus, the district court did not err in denying Mr. Alcaraz-Arellano's motion to suppress.

## II. MOTION TO DISMISS

### A. Background

-15-

Mr. Alcaraz-Arellano filed a motion to dismiss the indictment for selective enforcement, arguing that Deputy Schneider's decision to stop him was based, at least in part, on his race. He also requested discovery regarding selective enforcement, seeking information on various policies governing the Russell County Sheriff's Department, including policies to guard against racial profiling and document-retention policies; personnel files of Deputy Schneider and any records regarding racial-profiling complaints against him; records of Deputy Schneider's vehicle stops from the beginning of 2000 until February 9, 2003; and materials relating to Deputy Schneider's drug-interdiction training.

At the hearing on the motion to dismiss, the parties stipulated to admitting into evidence the record of the hearing in *United States v. Mesa-Roche*, 288 F. Supp. 2d 1172 (2003), on a similar motion to dismiss for racial profiling. That hearing focused on a study commissioned by the Kansas legislature and released in early 2003 (the Lamberth study). The Lamberth study examined stops made by law-enforcement officers in several Kansas metropolitan areas and along certain stretches of interstate highway in Kansas. The highway stops included in the study occurred between October 2001 and March 2002. The study attempted to compare the proportion of drivers of certain racial or ethnic groups stopped by police officers (stop data) to the proportion of drivers who belonged to those groups (benchmark data). Among the findings was that on I-70 between the

-16-

Colorado border and mile marker 50 (near Colby, Kansas), 6.8% of stops made by the Kansas Highway Patrol were of Hispanics, while the proportion of Hispanics traveling on that stretch of highway was only 1.8%.

Mr. Alcaraz-Arellano also presented data regarding traffic stops and arrests by officers in the Russell County Sheriff's Department, including (1) records of Deputy Schneider's stops, which showed that 33.69% of those he stopped between September 2000 and April 2003 were Hispanic; and (2) a report showing that during January through October 2002, in cases involving Deputy Schneider, 57% of the people arrested for drug crimes after being stopped for traffic violations were Hispanic. In district court and on appeal Mr. Alcaraz-Arellano did not compare these percentages to those of fellow officers except that at oral argument in this court his counsel pointed out that Deputy Bauske did not stop any Hispanics in 2000.

The district court denied Mr. Alcaraz-Arellano's motion to dismiss. The court noted that "[a]lthough [Mr. Alcaraz-Arellano's] motion is styled as a motion regarding selective prosecution, . . . it is in fact a motion regarding selective enforcement [because it] challenges the decision and actions of the law enforcement officer, not the exercise of discretion by the prosecutor." Vol. I, Doc. 70 at 16. It ruled that he did not carry his burden of producing "some

evidence" of discriminatory effect and discriminatory intent as required by *United States v. Armstrong*, 517 U.S. 456, 468-69 (1996).

Relying in part on testimony at the *Mesa-Roche* hearing by Dr. Brian Withrow, a professor of Criminal Justice at Wichita State University, the district court found the Lamberth study to be "irrelevant and unreliable." Vol. I , Doc. 70 at 23. It pointed out that the Russell County Sheriff's Department did not participate in the study and that Deputy Schneider had not worked in any of the areas covered in the study. (In fact, the record shows that Mr. Alcaraz-Arellano was stopped at mile marker 188 in Russell County, at least 138 miles east of the western portion of 1-70 canvassed by the Lamberth study, and more than 160 miles from the eastern portion of 1-70 canvassed by the study.) The court said that data regarding highway travelers in other counties would be transferable to Russell County only under the assumption that the percentages of racial groups in the population and among drivers are the same in both locations, but Mr. Alcaraz-Arellano had shown no reason to make such an assumption. It also doubted the accuracy of the benchmark data in the counties studied. The court declared that (1) the study did not include an appendix showing how the data was collected in the field, (2) the sample size was "too small to provide reliable statistical results," *id.* at 25, and (3) the surveyors' attempts to determine the ethnicity of drivers were based on "subjective and swift, if not split-second observations" and was

therefore not reliable, *id.* In addition, the court said that the stop data was untrustworthy because the law enforcement agencies and the areas included in the study were not selected at random and because the law enforcement officers who recorded the stop data knew that their activity was being observed.

The court further stated that even if the study was accepted as reliable, its results did not necessarily show racial profiling because racial or ethnic groups may not commit traffic violations in exact proportion to their representation on the highway. Finally, the court said that the arrest statistics could not satisfy Mr. Alcaraz-Arellano's burden under *United States v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001), to show that "'a similarly-situated individual of another race could have been, but was not, arrested or referred for federal prosecution for the offense for which the defendant was arrested and referred,'" Vol. I, Doc. 70 at 31 (quoting *James*, 257 F.3d at 1179). For the arrest statistics to be relevant to Mr. Alcaraz-Arellano's case, they would have to show "that non-Hispanics stopped for traffic violations were not detained and searched, even if they displayed indicators of drug trafficking, while similarly situated Hispanics [*sic*] drivers were detained and searched." *Id.* at 32.

As for the evidence specifically relating to Deputy Schneider, the court said that records of *arrests* and *charges* had no bearing on Mr. Alcaraz-Arellano's claims of selective *stops*. The court also found unremarkable the evidence that

Deputy Schneider stops Hispanics more frequently than other Russell County officers, as Officer Schneider patrols I-70 almost exclusively, while the other officers patrol the surrounding city and county of Russell, and "there are more Hispanics traveling on I-70 than there are living in the surrounding city and county of Russell." *Id.* at 33-34. The court decided that any comparison between the Hispanic component of stops made by the Kansas Highway Patrol on the 50-mile stretch of I-70 near Colby (6.85%) and the Hispanic component of stops made by Officer Schneider (33.69%) would be invalid because he had found that the Lamberth study was fatally flawed. In sum, the court ruled that Mr. Alcaraz-Arellano's statistics were insufficient to show discriminatory effect.

The district court was also unpersuaded that Mr. Alcaraz-Arellano had produced evidence of discriminatory intent. The court said that in order to show discriminatory intent, Mr. Alcaraz-Arellano must "present some non-statistical evidence to demonstrate that Deputy Schneider acted with discriminatory intent when he stopped defendant." *Id.* at 36. It noted that Deputy Schneider "is not alleged to have engaged in any racial language or actions other than the stop itself." *Id.* at 36-37. The court considered the Lamberth study to be irrelevant to discriminatory *intent* because it did not attempt to show that the observed law-enforcement officers knew the race of drivers before making the decision to stop them.

**B. Analysis**

Mr. Alcaraz-Arellano appeals the district court's denial of his selective-enforcement motion to dismiss and his accompanying motion for discovery. The "Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996); *see Wayte v. United States*, 470 U.S. 598, 608 n.9 (1985) (ban on discriminatory law enforcement applies to the federal government under the Fifth Amendment). "Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003).

The Supreme Court has held that a person making a selective-prosecution claim must establish two elements: "[1] the federal prosecutorial policy had a discriminatory effect and [2] it was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465 (internal quotation marks omitted). "To establish a discriminatory effect in a [*selective-prosecution*] race case, the claimant must show that similarly-situated individuals of a different race were not prosecuted." *Id.* The elements are essentially the same for a *selective-enforcement* claim. A defendant "challenging alleged racial discrimination in traffic stops and arrests

must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003). To satisfy the discriminatory-effect element, one who claims selective enforcement "must . . . make a credible showing that a similarly-situated individual of another race could have been, but was not, [stopped or] arrested . . . for the offense for which the defendant was [stopped or] arrested . . . ." *James*, 257 F.3d at 1179. And the discriminatory-purpose element requires a showing that discriminatory intent was a "motivating factor in the decision" to enforce the criminal law against the defendant. *Marshall*, 345 F.3d at 1168. Discriminatory intent can be shown by either direct or circumstantial evidence. *See United States v. Deberry*, 430 F.3d 1294, 1299 (10th Cir. 2005).

The standard for proof of a selective-prosecution claim is a "demanding" one, *Armstrong*, 517 U.S. at 463, because a selective-prosecution claimant is requesting the judiciary to exercise power over a "special province" of the executive branch, *id*. 464, and judicial review of prosecutorial decisions could "chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy," *id.* at 465 (internal quotation

marks omitted).  Similar caution is required in reviewing a claim of selective law enforcement.  "[C]harges of racial discrimination . . . may be easy to make and difficult to disprove."  *Marshall*, 345 F.3d at 1167.  Executive-branch officials possess broad discretion in determining when to make a traffic stop or an arrest. *See id*.  Judicial interference with law-enforcement discretion might "induce police officers to protect themselves against false accusations in ways that are counterproductive to fair and effective enforcement of the laws," such as by directing law-enforcement resources away from minority neighborhoods.  *Id*. Accordingly, the standard for proving a selective-enforcement claim should be, as with selective-prosecution claims, "a demanding one."  *Marshall*, 345 F.3d at 1167, (quoting *Armstrong*, 517 U.S. at 463).

For similar reasons discovery is limited.  As we stated in *James*, "the showing necessary to obtain discovery for a selective prosecution defense must 'itself be a significant barrier to the litigation of insubstantial claims.'"  *James*, 257 F.3d at 1178 (quoting *Armstrong*, 517 U.S. at 464).  Although defendants seeking discovery need not establish a prima facie case of selective prosecution, *id*. at 1178, they must satisfy a "rigorous standard," *Armstrong*, 517 U.S. at 468. They must produce "some evidence" of both discriminatory effect and discriminatory intent.  *Armstrong*, 517 U.S. at 470; *accord United States v. Bass*,

536 U.S. 862, 863 (2002) (per curiam). In *James* we applied this standard to a claim of selective enforcement. *See id.* at 1178-81.

We review for abuse of discretion the district court's grant or denial of a motion to dismiss an indictment. *United States v. Furman*, 31 F.3d 1034, 1037 (10th Cir. 1994). In *James*, 257 F.3d at 1178, we reviewed a selective-prosecution *discovery order* de novo rather than for abuse of discretion. We distinguished *Furman* on the grounds that the defendant in *James* was seeking discovery rather than dismissal and that review of the discovery order involved only a determination of the legal adequacy of the evidence rather than a determination of facts. *See id.* at 1178. When, however, as in this case, the decision regarding discovery properly rests on fact-finding, we review the findings under the clearly-erroneous standard. *Cf. English v. Cody*, 241 F.3d 1279, 1282 (10th Cir. 2001) (we review a "district court's legal conclusions de novo and its factual findings under the clearly erroneous standard." (internal quotation marks omitted)).

Mr. Alcaraz-Arellano's claims fail on the intent prong of the tests for dismissal and discovery. He attempts to prove intent through statistical evidence of a discriminatory effect. He argues that the "sheer disparity" between the percentage of Hispanics on the road and the percentage of Hispanics stopped shows that Deputy Schneider targets them. Aplt. Br. at 40. *See Int'l Bhd. of*

*Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977) ("Statistics showing racial or ethnic imbalance are probative . . . because such imbalance is often a telltale sign of purposeful discrimination"). Here, however, we have direct evidence of Deputy Schneider's motivation in stopping Mr. Alcaraz-Arellano. At the hearing on the motion to dismiss, Deputy Schneider testified that he had decided to stop Mr. Alcaraz-Arellano as soon as he had determined by radar that he was speeding. The district court accepted Deputy Schneider's testimony, stating: "[Deputy Schneider] noticed a gold car traveling eastbound, and determined by radar that it was going 77 m.p.h. in a 70 m.p.h. zone. Deputy Schneider routinely stops cars going that speed . . . and decided to stop this one as well." Vol. I, Doc. 70 at 1. Mr. Alcaraz-Arellano contends that Deputy Schneider does not make a decision based solely on speeding but also considers the driver's ethnicity. He points to Deputy Schneider's practice of pulling alongside the vehicle to look inside before executing a stop, thus allowing him to determine the race of the individuals inside. He also notes the disproportionate number of Hispanic drivers that Deputy Schneider stops—34% of his stops in a two-year period were of Hispanics. This evidence has substantial appeal. But we defer to the factfinder's evaluation of credibility. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). And the district court's finding that the decision to stop Mr. Alcaraz-Arellano's car was made before Deputy Schneider

drove up to it forecloses any possibility that he made the decision to stop based on Mr. Alcaraz-Arellano's ethnicity. Mr. Alcaraz-Arellano does not argue that Deputy Schneider could have determined Mr. Alcaraz-Arellano's ethnicity at the time of the radar reading, when the vehicles were approaching one another at something like 140 mph.

Because the district court made a factual finding that Deputy Schneider made the decision to stop Mr. Alcaraz-Arellano before knowing his ethnicity, he cannot satisfy the discriminatory-intent prong of the *Armstrong* standard for obtaining discovery or dismissal on the basis of selective enforcement. Perhaps Mr. Alcaraz-Arellano could have convinced the district court otherwise if he were able to obtain the requested discovery. But he does not argue on appeal how discovery would help in that regard, and it is not apparent to us. The data on Deputy Schneider presented to us by Mr. Alcaraz-Arellano indicates that he already possesses the relevant information regarding Deputy Schneider's stops and arrests. The district court did not abuse its discretion in denying discovery[1]

Having held that Mr. Alcaraz-Arellano failed to present evidence satisfying *Armstrong*'s discriminatory-intent prong, we need not address whether the

---

[1] Although direct evidence establishes that Deputy Schneider was not motivated by race in his decision to stop Mr. Alcaraz-Arellano, the stop statistics that Mr. Alcaraz-Arellano has presented are disturbing. We assume that in future investigations federal prosecutors will take the utmost care to assure themselves that racial profiling is not lurking behind such statistics.

evidence he presented satisfied the discriminatory-effect prong. *See James*, 257 F.3d at 1181.

## III. CONCLUSION

Deputy Schneider's detention of Mr. Alcaraz-Arellano and his search of the car did not violate the Fourth Amendment. Therefore, we AFFIRM the district court's denial of the motion to suppress evidence. Also, Mr. Alcaraz-Arellano has not satisfied his burden to present some evidence of discriminatory intent, so we AFFIRM the order of the district court denying his motions to dismiss and for discovery.