**UNITED STATES COURT OF APPEALS**

June 10, 2008

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MIGUEL MONTES,

      Defendant - Appellant.

No. 07-5146
(D.C. No. CR-07-64-CVE)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **HOLLOWAY**, and **GORSUCH**, Circuit Judges.

      Miguel Montes challenges the district court's decision granting the government's motion to quash his subpoena seeking the production of certain Oklahoma police records as well as its denial of his motion to suppress drugs found in a search of his vehicle. We affirm the district court on both counts, concluding that Mr. Montes has not met the threshold required by our precedent to obtain the discovery he seeks and that his fifteen minute roadside detention accorded with the Fourth Amendment's dictates.

---

     [*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I

On April 3, 2007, Mr. Montes was traveling eastbound on Interstate 44 in Oklahoma in a black BMW X5. Interstate 44 features toll plazas that allow cars with an electronic signaling pass to continue past without slowing down but require other vehicles to exit the Interstate to the right and enter the toll plaza to pay. Around midday, Mr. Montes approached the toll plaza at mile marker 285. He traveled in the right lane of the turnpike and then veered to the right as the lane divided at the entry to the toll plaza.

At this time, State Trooper Gene Hise was in his parked patrol car facing the oncoming traffic. When Mr. Montes's vehicle was approximately one-eighth mile away from him, Trooper Hise noticed that Mr. Montes failed to signal a lane change when exiting the Interstate; as the vehicle passed him, Trooper Hise also observed that it had a temporary Illinois paper license plate. Trooper Hise later testified that, at that point, he intended to stop the BMW for failure to signal.

After Mr. Montes passed through the toll booth, Trooper Hise turned on the patrol car's lights, which activated his dash camera, and pulled over the vehicle. At approximately 12:47 p.m. (according to the dash camera videotape of the encounter), Trooper Hise approached the BMW on the passenger side and first observed that Mr. Montes is Hispanic. Trooper Hise also saw a female passenger in the front seat and two small children in the back seat. He later testified that the female would not look at him and appeared "extremely nervous." App. at 111.

Trooper Hise also immediately noticed the "overwhelming odor of air freshener" and saw two air fresheners hanging from the steering column. *Id.* A twelve-year drug interdiction veteran with the Special Operations Division of the Oklahoma Highway Patrol, Trooper Hise later testified that BMW X5s are used to smuggle drugs and currency because their flooring system contains natural voids under the front seats that, while designed for soundproofing, can be modified to hide substantial quantities of contraband.

Approaching the vehicle at 12:47 p.m., Trooper Hise explained to Mr. Montes why he stopped him and that he was going to issue a warning citation for the signal violation. The trooper asked Mr. Montes to accompany him to the patrol car, which Trooper Hise testified is his common practice for safety reasons. Trooper Hise and Mr. Montes arrived at the patrol car at 12:48 p.m. and sat in the front seats of the car.

Once in the patrol car, Trooper Hise asked Mr. Montes about his failure to signal, and Mr. Montes conceded that, although he usually uses his turn signal when changing lanes, he did not do so in this instance. Trooper Hise asked Mr. Montes where he lived and when he bought the BMW X5. Mr. Montes responded that he lived in Little Rock, California and purchased the vehicle three months earlier. Because the vehicle had a temporary Illinois license plate, Trooper Hise asked whether Mr. Montes purchased it in Illinois; Mr. Montes answered in the affirmative. As Trooper Hise inspected Mr. Montes's California license and

began filling out the warning citation, he asked about Mr. Montes's name and his address in Little Rock, which was apparently different from that on his license. At 12:52 p.m., Trooper Hise asked Mr. Montes about his travel plans and Mr. Montes replied that he was driving to Illinois to see his parents for spring break. Trooper Hise then asked Mr. Montes what he did for a living; Mr. Montes responded that he owned a landscaping business, and the trooper told Mr. Montes that he recently sold his own landscaping business.

At 12:53 p.m., Trooper Hise called dispatch to conduct a check on Mr. Montes's license, criminal history, and warrants. While waiting for dispatch to respond to these inquiries, Trooper Hise and Mr. Montes discussed their respective landscaping businesses. Trooper Hise later testified that he found Mr. Montes's landscaping knowledge to be questionable and he observed that Mr. Montes avoided eye contact and hesitated when answering basic questions. The trooper also found Mr. Montes to be unusually nervous because, unlike most people, he did not calm down after learning he would receive only a warning citation.

Trooper Hise then asked Mr. Montes if he had ever been arrested, and Mr. Montes stated that he had been arrested ten years earlier. While Mr. Montes was explaining his prior arrest, dispatch responded at approximately 12:58 p.m. that Mr. Montes's license was valid and he was not wanted for any crimes. Dispatch confirmed that Mr. Montes had been charged with possession of marijuana for

sale in 1997 but that charge was dismissed pursuant to Mr. Montes's plea to another charge. The dispatch report lasted approximately one minute.

After the dispatch report, at approximately 12:59 p.m., Trooper Hise approached the BMW on the passenger side to request the vehicle registration. The passenger did not understand Trooper Hise's request, so Mr. Montes then agreed to accompany Trooper Hise to the vehicle at 1:00 p.m. to retrieve the registration. By this time, Trooper Ty Owen had arrived on the scene and stood at the rear of the BMW. Trooper Owen had heard Trooper Hise's radio traffic and came to the scene of his own accord, without a request by or previous arrangement with Trooper Hise. As Mr. Montes and Trooper Hise returned to the patrol car at 1:01 p.m. with registration in hand, Trooper Hise asked Trooper Owen to walk his drug detection dog around the BMW while Trooper Hise checked the registration. Trooper Hise testified that he asked Trooper Owen to conduct the dog sniff of the vehicle in order to save time because, although Trooper Hise also had a drug detection dog in his car, it would take longer for him to conduct the traffic stop and walk his dog around the BMW.

Upon returning to the patrol car, Trooper Hise asked Mr. Montes about the Illinois address listed on the registration. Mr. Montes explained that the address was a friend's house in a suburb of Chicago, where he stayed over on a trip. Trooper Hise asked why Mr. Montes did not list his California address on the registration, but Mr. Montes only responded that he bought the vehicle in Illinois.

- 5 -

Around this time, at 1:02 p.m., Trooper Owen's drug detection dog alerted to the smell of drugs by changing direction and jumping when he passed the front passenger area of the BMW. Trooper Owen continued to walk the dog around the car and when it passed by the front passenger area again the dog aggressively alerted by scratching and jumping. This second alert occurred at 1:03 p.m.[1] Sitting in the patrol car, Trooper Hise and Mr. Montes could see the dog's behavior. Trooper Hise then asked Mr. Montes about drugs and he denied any involvement. After informing Mr. Montes that the dog alert gave the troopers probable cause to search the vehicle for drugs, the troopers asked the passenger and two children to move from the BMW to Trooper Hise's patrol car and they began searching the vehicle. The troopers discovered that the front passenger seat had been moved and, through a seam cut in the carpet, they could see a hole drilled into the floor, through which they saw food saver bags. The troopers removed the seat and discovered nineteen kilograms of cocaine powder in the bags filling the void underneath the seat.

Federal prosecutors charged Mr. Montes with possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(A)(ii). Mr. Montes filed a motion to suppress the cocaine recovered from his vehicle. He also issued a subpoena *duces tecum* requesting "[r]eports,

---

[1] Trooper Darren Koch also arrived at approximately this time. Like Trooper Owen, he had heard Trooper Hise's radio traffic and came to the scene as backup.

records, intra-office communications, warning tickets, memoranda and writings of the Oklahoma Department of Public Safety or the Oklahoma State Police" concerning 2006 and 2007 traffic stops by Troopers Hise, Koch, and Owen "to issue warning tickets to African-American, Hispanic-American, [and] American-Indian motorists and use K-9 alert dogs at mile marker 285." Appellant's Br. Ex. B. The government filed a motion to quash the subpoena. After hearing argument, a magistrate judge granted the government's motion to quash, concluding that Mr. Montes failed to meet the evidentiary threshold required by Supreme Court precedent to support his request for discovery, Magistrate Op. at 2, and the district court adopted this ruling, *see* D. Ct. Op. at 7.

The district court then held a hearing on Mr. Montes's suppression motion, entertaining testimony from Troopers Hise, Koch, and Owen, and Mr. Montes's private investigator. The court also viewed the videotape of the stop and listened to the audio recording of Trooper Hise's interaction with dispatch. In due course, the court issued a written ruling holding that the initial traffic stop was valid; the stop was not pretextual or based on Mr. Montes's race; the length and scope of the stop were reasonable and related to its initial purpose; even if the stop was prolonged beyond its initial purpose, Trooper Hise had reasonable suspicion to prolong the stop; use of the drug detection dog was lawful; and the warrantless search of the vehicle following the dog alert was supported by probable cause. D. Ct. Op. at 7-17.

After these rulings, Mr. Montes entered a conditional guilty plea subject to an appeal of both the quashing of his subpoena and the denial of his motion to suppress. The district court sentenced him to 120 months' imprisonment followed by five years of supervised release.

## II

Whether Mr. Montes has presented evidence legally adequate to support his request for discovery on his selective enforcement claim is a question of law we review *de novo*. *United States v. James*, 257 F.3d 1173, 1178 (10th Cir. 2001). Under governing precedent, Mr. Montes is entitled to discovery on his claim, and so may overcome the government's motion to quash, "only if he presents 'some evidence tending to show the existence of the essential elements of the [selective enforcement] defense, discriminatory effect and discriminatory intent.'" *Id.* (quoting *United States v. Armstrong*, 517 U.S. 454, 468 (1996)). The costs associated with discovery in a selective enforcement claim, we are told, require a "rigorous standard for discovery in aid of such a claim," and the Supreme Court's threshold showing requirement "balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." *Armstrong*, 517 U.S. at 468, 470.

What are the "essential elements" of a selective enforcement claim? To establish discriminatory effect, a defendant claiming race-based selective enforcement in a traffic stop or arrest must "make a credible showing that a

similarly-situated individual of another race could have been, but was not, stopped or arrested for the offense for which the defendant was stopped or arrested." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006). Discriminatory intent, meanwhile, may be established by direct or circumstantial evidence indicating that discriminatory intent was a "motivating factor in the decision to enforce the criminal law against the defendant." *Id.*

We agree with the district court that Mr. Montes has failed to adduce the requisite "some evidence" suggestive of discriminatory effect or intent to entitle him to the discovery he seeks. Trooper Hise testified that he could not even discern Mr. Montes's race when he effected the stop because, among other things, the side windows of the BMW were tinted. Before us, Mr. Montes himself does not dispute this testimony.[2] Instead, Mr. Montes argues that, even if the trooper did not know his race when effecting the stop, the trooper learned his race when he approached the BMW and this influenced the nature and duration of the stop Trooper Hise effected. The difficulty with this argument, as the district court observed, is that the record is devoid of facts suggesting that Trooper Hise or the Oklahoma Highway Patrol treat people of different races differently when they carry out roadside stops. And we are of course not free to disregard the Supreme

---

[2] To be sure, Mr. Montes's private investigator testified in the district court that, on a later date, he could identify the race of drivers approaching the toll booth. But, as the district court found, the private investigator did not see any BMW X5s with tinted side windows and neither was he situated where Trooper Hise was on the day of the arrest.

Court's direction that, absent the "threshold" evidentiary showing of "*some evidence tending to show*" discriminatory effect or intent, *Armstrong*, 517 U.S. at 458, 468 (emphasis added), Mr. Montes is not entitled to the sort of discovery he seeks.

## III

Turning to Mr. Montes's suppression motion, we review *de novo* the legal question whether his traffic stop comported with the Fourth Amendment, though in doing so we are obliged to accept the district court's factual findings, unless clearly erroneous, and view the evidence in the light most favorable to the prevailing party in the district court, here the government. *Alcaraz-Arellano*, 441 F.3d at 1258.

A traffic stop complies with the Fourth Amendment if it is justified at its inception and remains "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968). Before us, Mr. Montes concedes that his initial stop was justified by his failure to signal, and he does not contest that the drug dog alert gave the troopers probable cause to detain him and search his vehicle. The only remaining question for us, then, is the reasonableness of the fifteen minute detention between the initial stop and the dog alert.[3]

---

[3] Our calculation of fifteen minutes (12:47 to 1:02 p.m.) is based on the time between the initial stop and the drug detection dog's first alert. Mr. Montes

(continued...)

- 10 -

A traffic stop must be "temporary and last no longer than is necessary to effectuate the purpose of the stop"; after the brief detention required to achieve that purpose, the motorist must be allowed to continue on his or her way. *Florida v. Royer*, 460 U.S. 492, 500 (1983); *see United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission," *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), but the cases "impose no rigid time limitation on *Terry* stops," *United States v. Sharpe*, 470 U.S. 675, 685 (1985).

In this case, the total time of the traffic stop before the dog's initial alert – fifteen minutes – is within the range of what we have approved for a routine warning stop. *See, e.g.*, *United States v. Patterson*, 472 F.3d 767, 777 (10th Cir. 2006) (thirteen minutes and twenty-seven seconds); *United States v. Briseno*, 163 F. App'x 658, 664 (10th Cir. 2006) (nineteen minutes); *United States v. Garner*, 68 F. App'x 930, 932 (10th Cir. 2003) (fifteen minutes). This is not the end of our inquiry, however, because the way the troopers spent this time matters – our cases do not establish a traffic stop timer such that an officer may do as he or she pleases until the buzzer sounds. Rather, we must analyze the totality of the

---

[3](...continued)
argues that his detention actually began at 12:43 p.m. and that the district court erred in finding that the detention began at 12:47 p.m. We have viewed the videotape of the encounter and confirm that Trooper Hise pulled Mr. Montes over at 12:47 p.m., so the district court's finding is not clearly erroneous.

circumstances to determine whether this detention, including the manner in which it was carried out, was reasonably related in scope to the initial purpose of the stop or whether the troopers unnecessarily prolonged the detention. *See Terry*, 392 U.S. at 19-20; *Sharpe*, 470 U.S. at 685; *Alcaraz-Arellano*, 441 F.3d at 1258.

Beginning at the beginning of the traffic stop, Trooper Hise and Mr. Montes arrived at the patrol car one minute after they pulled over to the side of the road, which indicates only minimal conversation took place at Mr. Montes's vehicle. In the patrol car, Trooper Hise spent approximately five minutes before calling dispatch writing a warning citation and asking Mr. Montes about his failure to signal, information on his license necessary for the citation, his travel plans, and his ownership of the BMW. Our precedent clearly indicates that inquiries of this sort are permissible in routine traffic stops and that the time spent by Trooper Hise to make them, while at the same time preparing a traffic citation, was reasonable. *See, e.g.*, *Alcaraz-Arellano*, 441 F.3d at 1259; *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998); *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989).

After Trooper Hise called dispatch, he waited five minutes for a response and the dispatch report then lasted over one minute. Although Trooper Hise discussed topics other than the traffic infraction with Mr. Montes while they waited, this discussion did not prolong the detention so it did not violate the Fourth Amendment. *See Alcaraz-Arellano*, 441 F.3d at 1259; *United States v.*

- 12 -

*Wallace*, 429 F.3d 969, 974 (10th Cir. 2005) ("As long as the trooper's questioning did not extend the length of the detention . . . there is no Fourth Amendment issue with respect to the content of the questions.").  Mr. Montes himself does not argue that this period of time represents an unreasonable length of time for dispatch to take in responding.  Instead, he submits only that "[t]he purpose of the stop – to warn the motorist – was abandoned from the outset" when Trooper Hise did not simply warn Mr. Montes to use his turn signal in the future and let him continue on his way.  Appellant's Br. at 27.  The difficulty with this suggestion lies in Mr. Montes's own acknowledgment that in a routine traffic stop an officer may request a license and registration, run checks through dispatch, issue a citation, and ask questions that do not lengthen the detention; under our settled precedent, this is true even when the trooper stops the vehicle merely to issue a warning citation.  *See, e.g.*, *Patterson*, 472 F.3d at 772-73, 776; *Alcaraz-Arellano*, 441 F.3d at 1256-57, 1259; *Wallace*, 429 F.3d at 971-72, 974.

Finally, after dispatch responded on the license, warrants, and criminal history check, at 12:59:22 p.m. Trooper Hise requested Mr. Montes's vehicle registration.  Obtaining the registration from the vehicle took a few minutes, both men returned to the patrol car with the registration at 1:01 p.m., and the drug dog made its initial alert  at 1:02 p.m.  This court has consistently held that it is within the scope of a routine traffic stop for a trooper to request and inspect the vehicle registration and call dispatch to check its validity.  *See Hunnicutt*, 135 F.3d at

- 13 -

1349; *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993). The registration request in this case, however, appears at least arguably unusual, in that the trooper did not request the registration initially along with the driver's license, but instead requested it separately, thereby prolonging the stop after already writing the warning and running the dispatch checks. Significantly, however, Mr. Montes does not mention this point as a cause for concern or develop any evidence or argument about whether this is an unusual situation or unreasonable practice. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived.").

Even had he raised an argument along these lines, however, and whatever the propriety may be of seriatim requests for a driver's license and vehicle registration as a general matter, various circumstances associated with this particular case persuade us that any delay caused by the registration request was reasonable. First, Trooper Hise learned information during the preceding twelve and a half minutes that made further inquiry into the status of the car's registration reasonable. When he pulled the BMW over, Trooper Hise knew it had a temporary Illinois tag, but only during his discussion with Mr. Montes did Trooper Hise learn that Mr. Montes's license was from California instead of Illinois, that he gave as his residence a California address apparently different from that listed on his license, and that Mr. Montes did not reside in Illinois when

he purchased the vehicle. Mr. Montes's difficulty reconciling the Illinois license plate and his various California addresses raised questions that an officer could reasonably think an inspection of the vehicle registration might answer. Second, the registration inquiry only added roughly two and a half minutes to the stop (in part because the trooper did not send the registration through dispatch separately and incur the additional delay that would have entailed). Third, Trooper Hise attempted to counter any delay by asking Trooper Owen to run his dog around the BMW while Trooper Hise asked about the registration. Although Trooper Hise had his own drug detection dog in the back of his patrol car, he chose not to walk it around the BMW because, as he testified, "that would have taken longer" than having Trooper Owen run his dog around the vehicle at the same time Trooper Hise checked the vehicle registration. App. at 158; *see also Patterson*, 472 F.3d at 777 n.3 (noting testimony of another trooper that this method is quicker).[4]

---

[4] We also note that this court has upheld multiple traffic stops in which the trooper requested the driver's license and vehicle registration separately, albeit without addressing the issue directly. *See Patterson*, 472 F.3d at 772-73 (trooper returned to driver's vehicle to retrieve registration five minutes after initial stop); *Alcaraz-Arellano*, 441 F.3d at 1256 (deputy asked driver to return to his vehicle to retrieve license and then asked him to return to his vehicle again to retrieve registration); *United States v. Vargas*, 57 F. App'x 394, 396 (10th Cir. 2003) (trooper returned to driver's vehicle to retrieve registration after running a license check through dispatch and chatting with driver in patrol car while writing warning citation).

Having found Mr. Montes's traffic stop reasonable, we have no need to reach the district court's alternative holding that reasonable suspicion of drug activity arose during the stop sufficient to justify any delay.

* * *

For the foregoing reasons, the judgment of the district court is affirmed.

ENTERED FOR THE COURT


Neil M. Gorsuch
Circuit Judge