**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Cleo PATTERSON, Defendant–Appellant.**

No. 05–6386.

United States Court of Appeals, Tenth Circuit.

Dec. 27, 2006.

Mary M. Smith, Assistant United States Attorney, (and John C. Richter, United States Attorney, on the brief), Oklahoma City, OK, for Plaintiff–Appellee.

James L. Hankins, Oklahoma City, OK, for Defendant–Appellant.

Before KELLY, LUCERO, and TYMKOVICH, Circuit Judges.

PAUL KELLY, JR., Circuit Judge.

Defendant–Appellant Cleo Patterson appeals his conviction and sentence on drug trafficking charges arising from the discov-

ery of 67 pounds of cocaine in his vehicle. After denial of his motion to suppress, Mr. Patterson was tried before a jury and convicted of possession with intent to distribute approximately sixty-seven pounds of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (count II) and traveling in interstate commerce with intent to further a drug trafficking enterprise in violation of 18 U.S.C. §§ 1952(a)(3) and 2 (count III). The jury was unable to reach a verdict on conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846 (count I). The district court sentenced Mr. Patterson to concurrent sentences of 360 months in prison on count II and 60 months on count III, followed by 60 months of supervised release on count II and 36 months on count III.

In this appeal, Mr. Patterson asserts that the district court erred by: (1) denying his motion to suppress the drug evidence seized from his van; (2) requiring him to proceed to trial alone with a jury he had jointly selected with his former co-defendant; (3) denying his Rule 29 motion for judgment of acquittal; (4) giving an unduly coercive partial verdict instruction; (5) relying on a drug quantity proven by a preponderance of the evidence in calculating his sentence; (6) refusing to reduce his offense level for acceptance of responsibility; (7) refusing to reduce his offense level for his minor role in the offense; (8) classifying him as a career offender based on his non-violent late return from a prison furlough; and (9) failing to dismiss the indictment because it was untimely under the Speedy Trial Act, 18 U.S.C. § 3162(a)(1). We have jurisdiction pursuant to 18 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we affirm.

*Background*

### I. The Traffic Stop

On December 31, 2004, shortly after 10 a.m., Oklahoma Highway Patrol Trooper Jeff Steelman observed a red Volkswagen van passing several vehicles while traveling eastbound on I–40. The trooper's radar indicated that the van was traveling 86 miles per hour, 16 miles per hour above the posted speed limit. The trooper activated his emergency lights and stopped the vehicle.

At 10:04 a.m.,[1] the trooper exited his patrol vehicle and approached the passenger's side of the van. He asked Mr. Patterson, the driver, to accompany him to his Suburban, and Mr. Patterson complied. The passenger, Herman Majors, Jr., remained in the van's back seat. The trooper later testified that nothing about the van's condition or its occupants aroused any suspicion during this initial encounter.

When the two men reached the patrol vehicle, the trooper got in on the driver's side and asked Mr. Patterson to sit in the front passenger's seat. The trooper informed Mr. Patterson that he intended to issue him a warning citation for speeding. Mr. Patterson then engaged the trooper in conversation about a wide variety of topics, including the radios in the vehicle, the trooper's name, and that Mr. Patterson had been shot in a bar. I Aplt. App. at 136.

Meanwhile, the trooper asked Mr. Patterson for proof of his registration and insurance, and Mr. Patterson replied that those documents were in a pocket on the van's door. At 10:09, the trooper returned to the van and asked Mr. Majors to hand him the documents; Mr. Majors did so. The trooper also briefly questioned Mr.

---

**1.** The video camera in the trooper's Suburban recorded this traffic stop. We have reviewed the video, which was considered by the district court at the suppression hearing and played for the jury at trial. The times noted herein were taken from the video tape.

Majors about his travel plans, and Mr. Majors explained that he and Mr. Patterson were returning from Amarillo, Texas, to Tennessee. Mr. Patterson had given the same account of their route. Then, at 10:10, the trooper returned to his vehicle and radioed to dispatch for a "Triple I" check on Mr. Patterson, which searched for warrants and verified the validity of his license and registration. While the trooper awaited a reply, Mr. Patterson remained talkative.

At 10:14, Oklahoma Highway Patrol Trooper Garrett Vowell arrived on the scene with his drug detection dog, Hilto. The two troopers spoke briefly outside the Suburban, but their discussion was not captured by the vehicle's recording device because Trooper Steelman had switched off his wireless microphone. Shortly thereafter, at 10:15, dispatch informed Trooper Steelman that it had completed the requested checks. Trooper Vowell then got into the back seat of Trooper Steelman's Suburban and observed Mr. Patterson. Meanwhile, Trooper Steelman got back into the driver's seat and received the reports from dispatch, which indicated that Mr. Patterson had a felony drug record but that his license was clear and the van was registered in his name. Both troopers later testified that Mr. Patterson seemed very nervous, talkative, and sweaty, and that he fidgeted and pulled at his shirt.

At 10:17, while Trooper Steelman finished filling out the warning citation, Trooper Vowell retrieved Hilto and began walking him around the van. Trooper Steelman explained the warning, and he asked Mr. Patterson to sign the citation at 10:17. At the very same time, Hilto alerted next to the driver's side door of the van.[2] Trooper Vowell continued walking around the van with Hilto, and Hilto again alerted, this time on the passenger's side. Trooper Steelman asked Mr. Patterson if he had anything illegal in the van. Mr. Patterson said "no" and then "a long time ago, maybe." Trooper Vowell circled the van with Hilto a second time, and, once again, the dog alerted.

After Hilto's third alert, Trooper Vowell asked Mr. Majors to step out of the van and ordered Hilto to go inside. Hilto alerted on the area between the two captain's chairs. The troopers then searched the van's interior and noticed an abnormality in the carpet. They peeled it back, revealing a fresh adhesive. Lifting the plywood below, the troopers discovered a hidden compartment in which they found 26 cellophane packages containing approximately 67 pounds of a white powder later determined to be cocaine. At 10:46, the troopers informed Mr. Patterson and Mr. Majors that they were under arrest.

After the two men were indicted, they moved to suppress the cocaine; the district court denied these motions on August 5, 2005, following a hearing. The court determined that the stop was justified because Trooper Steelman had clocked Mr. Patterson's van at 86 m.p.h. in a 70 m.p.h. zone, and it held that the duration of the stop was reasonable, noting that any extension beyond the bare minimum time needed to verify Mr. Patterson's records and write out the warning was caused by Mr. Patterson's loquaciousness. Alternatively, the court held that the detention was justified by reasonable suspicion.

---

**2.** Because of the camera angle, Hilto was out of view at the time of his first alert. However, Trooper Vowell testified to this alert at the suppression hearing and at trial. Viewing the evidence in the light most favorable to the government, as we must, see United States v. Cheromiah, 455 F.3d 1216, 1220 (10th Cir. 2006), we credit Trooper Vowell's testimony.

## II. The Trial

At jury selection on August 8, 2005, the district court required Mr. Patterson and Mr. Majors, as co-defendants, to share their peremptory challenges. Defense counsel did not object. Shortly after the jury was chosen, however, the government moved to dismiss the indictment against Mr. Majors. The court granted this motion the next morning, and Mr. Patterson began the trial as the lone defendant.

At trial, the government called four witnesses: (1) Trooper Steelman; (2) Trooper Vowell; (3) Pauline Orlando, a DEA forensic chemist who testified about the chemical analysis of the substances found in the van; and (4) DEA Agent Garth Hamelin, who testified to interviewing Mr. Patterson, examining the van, and transporting the evidence to the DEA lab for testing. After the government rested, Mr. Patterson moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. The district court denied the motion.

During deliberations, the jury sent a note asking the court for clarification and further definition of "intent to distribute." The court refused to provide any further definition, instructing the jury that it had received all of the law that it should appropriately consider. Later, the jury sent another note, this time indicating that it had agreed on verdicts for two of the three counts. The court, with the concurrence of counsel, instructed the jurors to continue deliberating. When the jury sent another note later that afternoon informing the court that it was taking a break but would resume deliberating, the court proposed a supplemental instruction stating that the jury had the option of returning a partial verdict. Over defense counsel's objection, the court read Sixth Circuit Pattern Jury Instruction 9.03 (2005) to the jury:

Members of the jury, you do not have to reach unanimous agreement on all charges before returning a verdict on some of them. If you have reached unanimous agreement on some of the charges, you may return a verdict on those charges and then continue deliberating on the others. You do not have to do this, but you can if you wish.

If you do choose to return a verdict on some of the charges now, that verdict will be final. You will not be able to change your minds about it later on. Your other option is to wait until the end of your deliberations and return all of your verdicts then. The choice is yours.

I would ask that you now return to the jury room and resume your deliberations.

II Aplt.App. at 407. Ultimately, the jury did return a partial verdict, convicting Mr. Patterson on counts II and III but deadlocking on count I.

## III. The Sentence

The Presentence Report (PSR) calculated a total offense level of 37 and a criminal history category of VI, leading to a Guideline sentencing range of 360 months to life on Count II. Mr. Patterson objected to the drug quantity calculation, arguing that the drug quantity was not proven beyond a reasonable doubt. He also sought reductions based on his acceptance of responsibility and his comparatively minor role in the offense. Finally, Mr. Patterson objected to his categorization as a career offender, challenging the PSR's determination that his escape conviction was a crime of violence. The district court overruled his objections and declined to reduce his offense level. However, the court sentenced Mr. Patterson at the bottom of the Guideline range, 360 months, on count II.

## Discussion

### I. The Denial of the Motion to Suppress

■ "We conduct a two-step inquiry when determining the constitutionality of a traffic stop, considering first whether the officer's action was justified at its inception, and second, whether it was reasonably related in scope to the circumstances that justified the interference in the first place." *United States v. Tibbetts*, 396 F.3d 1132, 1136 (10th Cir.2005). Mr. Patterson first argues that the stop was not justified at its inception because it was "merely a ruse to allow the Trooper to . . . [e]ffect an unlawful detention/search of the vehicle." Aplt. Br. at 21. He also contends that Trooper Steelman continued the traffic stop for longer than was necessary to conduct the Triple I check and write out the warning citation, and he argues that the cocaine should have been suppressed as the fruit of this unlawful detention. *Id.* at 24.

■ "When reviewing the denial of a motion to suppress, we accept the district court's factual findings unless clearly erroneous, and we review the evidence in the light most favorable to the government. However, we review de novo the ultimate determination of reasonableness under the Fourth Amendment because that is a legal conclusion." *United States v. Chavira*, 467 F.3d 1286, 1290 (10th Cir.2006) (citation omitted). The defendant bears the burden of establishing a Fourth Amendment violation. *Id.*

### A. The Justification for the Stop

■ "The validity of a traffic stop under the Fourth Amendment turns on whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *Tibbetts*, 396 F.3d at 1137 (internal quotation marks omitted). Reasonable suspicion may be based on the officer's personal observation of a traffic violation. *Id.* at 1136–37. The standard is an objective one; "it is irrelevant that the officer may have had subjective motives for stopping the vehicle." *Id.* at 1137.

■ Mr. Patterson attacks Trooper Steelman's decision to stop him on two grounds. First, he contends that Trooper Steelman had no interest in enforcing Oklahoma's traffic laws when he initiated the traffic stop in this case: "[m]embers of the Criminal Interdiction Division of the Oklahoma Highway Patrol, such as Trooper Steelman in this case, . . . are in the business of contacting as many motorists as possible in order to look for cues such as nervousness, air fresheners, divergent travel plans, etc., in an effort to detect drug couriers." Aplt. Br. at 21–22. Mr. Patterson candidly admits that precedent is against him, correctly citing *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), for the proposition that the "initial decision to stop [a] vehicle is reasonable where the police have probable cause to believe that a traffic violation has occurred" regardless of their subjective motivation. Aplt. Br. at 21. Recognizing this clear directive from the Supreme Court and its vitality, *see Brigham City v. Stuart*, — U.S. —, 126 S.Ct. 1943, 1948, 164 L.Ed.2d 650 (2006), we reject the argument that we can "impose a correspondingly greater scrutiny to the proffered justification for [drug interdiction officers'] traffic stops." Aplt. Br. at 21. We simply will not look beyond the *objective* justification provided by an observed traffic violation, regardless of the officer's unit assignment. *Whren*, 517 U.S. at 813, 116 S.Ct. 1769.

Mr. Patterson also argues that the radar reading obtained by Trooper Steelman was not sufficiently reliable to provide reason-

able suspicion that he was speeding. He points out that the trooper admitted that he was using a "dual speed" radar and that there were other cars on the highway, asserting that this testimony created "ambiguity" about whether Mr. Patterson's van was, in fact, traveling at 86 miles per hour. However, the trooper's uncontroverted testimony indicated that he observed Mr. Patterson pass the other vehicles on the highway, meaning that if the trooper's radar had mistakenly clocked one of the other vehicles, Mr. Patterson was driving even faster than 86 m.p.h.

In any case, the district court credited the trooper's testimony "that he clocked Patterson's van traveling sixteen miles per hour over the speed limit and that his radar was in proper working condition." I Aplt.App. at 66. This factual finding was supported by the evidence and not clearly erroneous. Therefore, the district court's conclusion that the observed violation of the speed limit gave Trooper Steelman reasonable suspicion for stopping Mr. Patterson followed from its factual findings.

### B. *The Scope of the Detention*

 It is clear that a "seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). However, we need not make a time and motion study of traffic stops; we consider the detention as a whole and the touchstone of our inquiry is reasonableness. Furthermore, "[a] traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed." *United States v. Alcaraz–Arel-*

*lano*, 441 F.3d 1252, 1259 (10th Cir.2006) (quoting *United States v. Martin*, 422 F.3d 597, 601–02 (7th Cir.2005)). Once the officer has completed the ticket and returned the driver's license and registration, however, he may not extend the scope of the detention by asking further questions without reasonable suspicion or consent. *Id.*

 Here, the detention began when Mr. Patterson pulled over to the curb at 10:04 a.m. Shortly after 10:17, Trooper Steelman had Mr. Patterson sign the warning citation and returned his documentation; at this point, the scope of the detention unquestionably expanded beyond the initial traffic stop for speeding. However, Hilto's alert, which occurred while Trooper Steelman was asking Mr. Patterson to sign the citation, provided the reasonable suspicion necessary to detain Mr. Patterson from the time of the alert until the time of the arrest.

The narrow question for us is whether the detention *prior to the alert* was unreasonable. In answering it, we must consider the individual circumstances that confronted the troopers, using "common sense and ordinary human experience" to determine whether "the police acted less than diligently, or … *unnecessarily* prolonged [the] detention." *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The detention of Mr. Patterson based only on his speeding violation lasted 13 minutes and 27 seconds. During this time, the trooper walked back and forth from his patrol vehicle to the van twice, spoke with both occupants about their travel plans, inspected Mr. Patterson's license, registration, and insurance information, contacted dispatch, waited for a Triple I check, filled in the warning citation, and explained the warning to Mr.

Patterson.[3] Precedent clearly indicates that these activities fit reasonably within the scope of the detention. *See, e.g., Muehler v. Mena,* 544 U.S. 93, 101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005) ("We have 'held repeatedly that mere police questioning does not constitute a seizure.' "); *Alcaraz–Arellano,* 441 F.3d at 1258–59; *United States v. Bradford,* 423 F.3d 1149, 1156 (10th Cir.2005) (holding that an officer may routinely ask about travel plans and vehicle ownership during a lawful traffic stop).

Meanwhile, Mr. Patterson engaged Trooper Steelman in conversation about a wide variety of topics, from the police radios in the patrol vehicle to his grandfather's farm to religious wars and the end of the world. The trooper testified that he chatted with Mr. Patterson because "[b]eing professional, you try not to just ignore the person and write and be rude. You want to listen to their conversation, what they have to say, make eye contact and try to make them feel more at ease and be personable." I Aplt. App. at 206.

In arguing that the detention was unreasonable, Mr. Patterson contends that Trooper Steelman should have immediately called in the Triple I check and then filled in the warning citation while waiting for the results. Instead, he examined Mr. Patterson's license and chatted with him for about three minutes before retrieving the insurance and registration. Then, he spent a minute and a half examining those

documents before requesting the Triple I. Finally, Trooper Steelman continued to converse with Mr. Patterson and left the patrol vehicle to speak with Trooper Vowell while he waited for the results of the Triple I check, only filling out the warning after hearing from dispatch. Mr. Patterson argues that, viewed in light of Trooper Steelman's assignment as an interdiction officer, this timeline indicates that he was dragging his feet throughout the stop in order to give Trooper Vowell time to arrive and run Hilto around the van.

 We disagree. Viewing the evidence in the light most favorable to the government, as we must, it is clear that Trooper Steelman acted reasonably. Mr. Patterson did the vast majority of the talking, and, as we have noted, "[w]hen a defendant's own conduct contributes to a delay, he or she may not complain that the resulting delay is unreasonable." *United States v. Shareef,* 100 F.3d 1491, 1501 (10th Cir.1996). Aside from the time he spent courteously listening to Mr. Patterson, Trooper Steelman moved quite quickly.

In sum, the 13 minute and 27 second detention was not unreasonable. Mr. Patterson complains of a four-minute delay after the citation was written, *see* Aplt. Br. at 25, but we find no evidence in the record-other than an apparent misstatement by defense counsel that the trooper rejected [4]-supporting such a delay. Be-

---

**3.** We also note that Trooper Steelman had his own drug detection dog, Cash, in the back of his Suburban throughout the stop but chose not to run him around the van because:

> It would have taken more time for me to get my dog out, stop writing the warning, run my canine around the vehicle, the two trips or whatever it took, put him back up and finish the warning and get my returns. It was quicker and detaining them a less amount of time [sic] to have Trooper Vowell

run his canine while I was still in the detention finishing out [sic] the warning.

I Aplt.App. at 170.

**4.** At the suppression hearing, the following exchange took place between defense counsel and Trooper Steelman:

> Q. So you held the ticket an additional four minutes-or four seconds before you told him to sign it; is that correct?

cause we conclude that the troopers did not extend the scope of the detention beyond what was reasonably necessary to effectuate the initial purpose of the stop until after the canine alert, we need not consider whether Mr. Patterson's demeanor or anything else gave the troopers reasonable suspicion to detain him before the dog alerted.

## II. The Shared Peremptory Challenges

■ The district court required Mr. Patterson to share his peremptory challenges with his then-co-defendant, Mr. Majors. As soon as jury selection was completed, the government moved to dismiss the indictment against Mr. Majors, and the district court granted this motion the next morning, immediately before opening statements. Mr. Patterson now urges us to reverse because "allowing his co-defendant to mold his jury ... violates basic notions of Due Process and fundamental fairness when it is clear that the Government will not proceed against the co-defendant at trial." Aplt. Br. at 43.

■ Mr. Patterson acknowledges that his attorney did not object to the requirement that he share peremptory challenges. As such, we review for plain error. *See United States v. Olano,* 507 U.S. 725, 734–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). To establish plain error, Mr. Patterson "must show: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affect[s] substantial rights," and we will not reverse unless the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Brooks,* 438 F.3d 1231, 1241 (10th Cir.2006).

■ A court may require co-defendants to share peremptory challenges. *Stilson v. United States,* 250 U.S. 583, 586, 40 S.Ct. 28, 63 L.Ed. 1154 (1919). The district court followed the proper procedure under Fed.R.Crim.P. 24(b)(2) in allocating peremptory challenges to Mr. Patterson and Mr. Majors. Simply put, Mr. Majors was in the case during jury selection, and the district court did not err.

## III. The Sufficiency of the Evidence

■ We review the record de novo to determine whether a reasonable jury could have found sufficient evidence to convict Mr. Patterson beyond a reasonable doubt. *United States v. Delgado–Uribe,* 363 F.3d 1077, 1081 (10th Cir.2004). In so doing, we view the evidence-both direct and circumstantial, including the reasonable inferences that can be drawn therefrom-in the light most favorable to the government. *Id.* We do not, however, "weigh conflicting evidence nor consider the credibility of witnesses. Instead, we must simply determine whether the evidence, if believed, would establish each element of the crime." *Id.* (internal citations, quotation marks and alterations omitted).

### A. *Count II: Possession With Intent to Distribute*

■ Mr. Patterson was convicted of possessing with intent to distribute five kilograms or more of a mixture containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. To sustain this conviction, the evidence must be sufficient to prove beyond a reasonable doubt that Mr. Patterson: "(1) possessed the controlled substance; (2) knew he possessed the controlled sub-

---

A. I don't know if it was four seconds or how long. I finished the warning and I had Mr. Patterson sign the warning.

I Aplt.App. at 173.

stance; and (3) intended to distribute ... the controlled substance." *United States v. McKissick*, 204 F.3d 1282, 1291 (10th Cir.2000). Possession may be actual or constructive; constructive possession exists where "a person knowingly has ownership, dominion, or control over the narcotics and the premises where the narcotics are found." *United States v. Reece*, 86 F.3d 994, 996 (10th Cir.1996). However, where there is joint occupancy of the place where the narcotics are found, the government must produce evidence "supporting at least a plausible inference that the defendant had knowledge of and access to [the narcotics]." *McKissick*, 204 F.3d at 1291.

■ Mr. Patterson claims that the government failed to prove knowledge, proving instead his mere proximity to the cocaine. He argues that the government's evidence did not establish how long he owned the van prior to the stop and that the government's expert on drug cases could not characterize the criminal activities of Mr. Majors and Mr. Patterson. Aplt. Br. at 34–35.

The evidence is more than sufficient to establish guilt. Trooper Steelman testified that Mr. Patterson was driving the van at the time of the traffic stop, that the van was registered in Mr. Patterson's name, and that Mr. Patterson repeatedly claimed to be the van's owner. He further testified that the compartment in which the cocaine was hidden was sophisticated, would have taken several days to install, and appeared to have been installed recently. Trooper Vowell and Agent Hamelin echoed these sentiments. Both troopers testified that Mr. Patterson seemed extremely nervous throughout the encounter, talking incessantly, sweating, fidgeting and tugging at his shirt. In addition, Agent Hamelin testified that the 67 pounds of cocaine seized from the van had a wholesale value of more than $500,000

and a probable street value in excess of $5 million. Finally, Ms. Orlando testified that her chemical analysis indicated that the substance found in the van's hidden compartment contained 86% pure cocaine hydrochloride.

From this evidence, a reasonable jury could have found all the elements of the offense beyond a reasonable doubt. Undoubtedly, the substance found in the van was cocaine. Mr. Patterson was the owner of the van, and it is highly unlikely that the previous owner would have sold him a vehicle containing a sophisticated hidden compartment that concealed contraband worth $5 million. Moreover, the evidence indicated that the compartment was recently installed, suggesting that the owner's knowledge and consent were necessary. Mr. Patterson's nervousness throughout the stop, despite Trooper Steelman's assurances that he would only get a warning citation, further supports the jury's conclusion that he knowingly possessed the cocaine.

Mr. Patterson also argues that there was insufficient evidence of his intent to distribute. We disagree. Agent Hamelin testified that the average street-level user could be expected to use about a quarter of a gram of cocaine at a time and that the cocaine found in Mr. Patterson's van would likely be diluted into at least 50,000 grams worth of usable cocaine; thus, Mr. Patterson was found in possession of approximately 200,000 doses of cocaine. Furthermore, Mr. Patterson himself told Trooper Steelman that he was "too old" for drugs. Together, these facts amply support the conclusion that Mr. Patterson intended to distribute the cocaine.

B. *Count III: Traveling in Interstate Commerce With Intent to Further a Drug Distribution Enterprise*

■ Mr. Patterson also challenges his conviction for traveling in interstate com-

merce with intent to further a drug distribution enterprise in violation of 18 U.S.C. §§ 1952(a)(3) and 2. To convict Mr. Patterson on this charge, the government needed to prove that he: "(1) traveled or used facilities in interstate commerce; (2) with intent to promote, manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on of a prohibited activity; and (3) thereafter attempted to or did in fact engage in one of the proscribed activities." *United States v. Dorrough*, 927 F.2d 498, 502 (10th Cir. 1991).

■ The first element was easily established: Mr. Patterson told Trooper Steelman and Agent Hamelin that he was traveling from Amarillo to Tennessee, and the December 29, 2004, Amarillo traffic ticket found in his vehicle proved at least that he had traveled from Texas to Oklahoma in the days immediately before his arrest. Mr. Patterson's intent to promote illegal activities was shown by the evidence tending to show he was aware of the cocaine in his car and that such a quantity of cocaine could only have been intended for distribution. Finally, the same evidence indicates that Mr. Patterson was arrested while attempting to transport cocaine from Texas to Tennessee so that it could be distributed.

## IV. The Partial Verdict Instruction

■ Mr. Patterson next argues that the district court erred by instructing the jury that it could return a partial verdict if it was not able to agree on all the counts of the indictment. As he acknowledges, Fed. R.Crim.P. 31(b)(2) provides that "[i]f the jury cannot agree on all counts as to any defendant, the jury may return a verdict

on those counts on which it has agreed." However, Mr. Patterson asserts that the charge given in this case was similar to an *Allen* charge. *See Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Mr. Patterson agrees that the district court properly instructed the jury to continue deliberating after being advised that the jury had reached agreement on two of the three counts. In light of that instruction, however, he argues that the partial verdict instruction given sua sponte several hours later pressured the jurors to abandon further deliberations.

■ As this partial verdict instruction did not urge deadlocked jurors to re-examine their views so as to avoid a mistrial, we reject its characterization as an *Allen* charge. *United States v. LaVallee*, 439 F.3d 670, 689 (10th Cir.2006). We still review for abuse of discretion, considering whether the supplemental instruction coerced a verdict. *Id.* at 691. We consider (1) the language used, (2) the presentation with other instructions, (3) the timing, and (4) the length of subsequent deliberations.[5] *Id.* at 689. We see nothing inherently coercive in the language of the district court's instruction. In the space of eight sentences, the court told the jurors no fewer than five times that they were not required to return a partial verdict. The instruction was peppered with words and phrases emphasizing the optional nature of the decision, including its closing sentence: "The choice is yours." II Aplt. App. at 407.

■ Next, we look to context in which the instruction was given. When issuing a supplemental sua sponte instruction, the court must be especially careful that the

---

5. Because the jury's note indicated that it had already agreed on verdicts for two of the three counts, we do not believe that the length of subsequent deliberations is particularly relevant in this case. Here, the jury needed to resume deliberations only long enough to decide whether to return the two verdicts it had already reached.

jury does not interpret the very issuance of the instruction as an indication that its deliberations are taking too long. We are satisfied, however, that there was no undue pressure here for three reasons. First, as noted, the court bent over backwards in the instruction to make clear that a partial verdict was optional. Second, the instruction came shortly after a question asking whether deliberations should continue. In light of the court's instruction a few hours earlier to continue (suggesting that the deliberations were not taking too long), we do not believe that the jury interpreted the supplemental instruction as an indication that the length of deliberation had suddenly become unreasonable. Finally, it is significant that the jury's note indicated that it had agreed on two of the counts, and it ultimately convicted Mr. Patterson on two of the counts. Thus, it cannot be said that the instruction coerced any jurors to change their minds or suppress their disagreement with the consensus. The district court did not abuse its discretion.

## V. The Sentencing Claims

Mr. Patterson also takes issue with four of the district court's Sentencing Guidelines calculations.[6] "When reviewing a district court's application of the Sentencing Guidelines, we review legal questions *de novo* and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Martinez*, 418 F.3d 1130, 1133 (10th Cir.2005). This standard remains unchanged in the wake of *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), which created an advisory Guidelines regime. *United States v. Wolfe*, 435 F.3d 1289, 1295 (10th Cir.2006).

### A. The Drug Quantity Enhancement

First, Mr. Patterson argues the district court erroneously increased his sentence by determining on its own the amount of cocaine. He contends that such facts must be found by the jury beyond a reasonable doubt. As he admits, however, there is clear precedent in this circuit that, under *Booker's* advisory regime, a district court may make Sentencing Guidelines calculations using facts found by the judge. *See United States v. Magallanez*, 408 F.3d 672, 684–85 (10th Cir.2005). Accordingly, we conclude that the district court did not err.

### B. The Acceptance of Responsibility Reduction

Next, Mr. Patterson contends that the district court erred by denying him a reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. He argues that he was prepared to plead guilty but was forced to go to trial in order to preserve his right to appeal the district court's denial of his motion to suppress. Mr. Patterson further urges that the Due

---

6. According to his brief, "Patterson asserts six errors in the District Court's calculation of his sentence under the Guidelines...." Aplt. Br. at 44. This statement is followed by four numbered sub-headings, each discussing one challenge, and we find no other asserted errors. Perhaps the other two errors were those "advanced ... in his written objections to the PSR," which Mr. Patterson attempted to renew in his brief. *See id.* at 49. Mr. Patterson has provided neither the PSR nor his objections to it in his appendix. Our rules clearly provide that "[w]hen the party asserting an issue fails to provide a record sufficient for considering that issue, the court may decline to consider it." 10th Cir. R. 10.3(B); *see also id.* R. 10.3(D)(3) ("The presentence investigation report *must* be included if the appeal is from a sentence imposed under 18 U.S.C. § 3742.") (emphasis added). Furthermore, we do not permit incorporation by reference. *Id.* R. 28.4. Therefore, we will address only the four contentions raised and discussed in Mr. Patterson's brief.

Process Clause required the district court to apply the acceptance of responsibility reduction because refusing to do so effectively punished him for vigorously asserting his Fourth Amendment rights.

A defendant may qualify for an offense-level reduction for acceptance of responsibility only if he "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). The Application Notes to the Guidelines provide:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt. . . . In rare situations[, however,] a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

*Id.* cmt. n. 2.

We reject Mr. Patterson's argument that this case presents one of the "rare situations" envisioned by the Guidelines. Mr. Patterson is not making a narrow legal challenge; he continues to make a broad challenge to the sufficiency of the evidence. As is his right, he has not admitted any factual guilt, but his position is inconsistent with an acceptance of responsibility.

We also reject the argument that the denial of the acceptance of responsibility reduction violated the Due Process Clause. The government was not required to offer Mr. Patterson a conditional plea that would preserve his right to appeal, *see United States v. Davis*, 900 F.2d 1524, 1527 (10th Cir.1990), and it chose not to do so. *See also United States v. Kuchinski*, 469 F.3d 853, 857–60 (9th Cir.2006) (upholding government's right to refuse conditional pleas on a separation of powers challenge). Had Mr. Patterson admitted his factual guilt, the Guidelines would have rewarded him with a reduced offense level. However, his ineligibility for such a reward is not a penalty that violates due process. *United States v. Portillo–Valenzuela*, 20 F.3d 393, 395 (10th Cir.1994).

## C. The Minor Role Reduction

Mr. Patterson also asserts that the district court should have granted him a reduction pursuant to U.S.S.G. § 3B1.2 because he was a minor or minimal participant in a criminal scheme.[7] He contends that he was merely a mule carrying drugs from Texas to Tennessee, arguing that "[t]here was no evidence at all at trial that Patterson was a major player in any conspiracy to distribute drugs." Aplt. Br. at 48. He also notes that "in fact the jury could not agree on whether a conspiracy even existed." *Id.*

Mr. Patterson is correct, but this is fatal to his position. As the Application Notes clearly provide, "[t]his guideline is not applicable unless more than one participant was involved in the offense." U.S.S.G. § 3B1.2 cmt. n. 2. The jury deadlocked on

---

**7.** U.S.S.G. § 3B1.2 allows reductions for "minimal" and "minor" participants in a criminal activity. Mr. Patterson never quite specifies which characterization he believes is appropriate for his situation. Because we determine that he does not qualify for the broader "minor participant" category, we need not consider separately whether he could qualify as a "minimal participant."

the conspiracy count, and the government dismissed the charges against Mr. Majors. There was no evidence that Mr. Patterson was part of a drug distribution ring, and he was the owner and the driver of the van in which the cocaine was discovered. Mr. Patterson had the burden of proving his minor or minimal participation, *United States v. Salazar–Samaniega*, 361 F.3d 1271, 1277 (10th Cir.2004), and the district court did not clearly err in concluding that he failed to do so.

D. *The Career Offender Classification*

█ Pursuant to U.S.S.G. § 4B1.1, the district court enhanced Mr. Patterson's offense level due to his career offender status. A defendant may qualify as a career offender if:

> (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant had at least two prior felony convictions of either a crime of violence or a controlled substance offense.

*Id.* Among Mr. Patterson's predicate felonies was a Tennessee conviction for escape arising from an incident where Mr. Patterson returned late from a furlough to attend his grandfather's funeral while he was a pretrial detainee. The district court rejected Mr. Patterson's argument that this was not a crime of violence, citing our opinion in *United States v. Turner*, 285 F.3d 909 (10th Cir.2002), as controlling the issue.

In *Turner*, we refused to draw a distinction between the Kansas crimes of simple escape and escape effected by or facilitated by violence for the purposes of the Career Offender enhancement. We noted that, in a long line of cases in this circuit, "[w]e have held categorically that an escape always constitutes conduct that presents a serious potential risk of physical injury to another," the lynchpin of a "crime of violence" under U.S.S.G. § 4B1.2(a)(2). *Turner*, 285 F.3d at 915–16. As we explained, "[e]ven though [the] initial circumstances of an escape may be non-violent, there is no way to predict what an escapee will do when encountered by the authorities. Every escape is a powder keg, which may or may not explode into violence." *Id.* at 916 (internal quotation marks omitted). In light of this clear precedent, the district court properly concluded that Mr. Patterson's escape conviction constituted a crime of violence.

VI. The Speedy Trial Act Claim

█ Finally, Mr. Patterson argues that he was indicted more than thirty days after his arrest in violation of the Speedy Trial Act, 18 U.S.C. § 3162(a)(1). This claim was raised for the first time in his reply brief in this appeal. A defendant forfeits the protections of the Speedy Trial Act by failing to move for dismissal before trial. *United States v. Lugo*, 170 F.3d 996, 1001 (10th Cir.1999). Moreover, "[i]ssues not raised in the opening brief are deemed abandoned or waived." *Coleman v. B–G Maintenance Mgmt.*, 108 F.3d 1199, 1205 (10th Cir.1997).

AFFIRMED.