**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 14, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LUIS ALBERTO PINA,

Defendant-Appellant.

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ERI LAJARA,

Defendant-Appellant.

No. 09-5014
(D.C. No. 4:08-CR-00106-TCK-1)
(N.D. Okla.)

No. 09-5057
(D.C. No. 4:08-CR-00106-TCK-2)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **KELLY**, **PORFILIO**, and **O'BRIEN**, Circuit Judges.

_____

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Luis Alberto Pina and Eri Lajara pled guilty to possessing more than five kilograms of cocaine with intent to distribute. They reserved the right to appeal from the denial of their motions to suppress and now argue the court erred in denying those motions. We affirm.[1]

I.

On May 5, 2008, an Oklahoma state highway trooper, Ty Owen, stopped a vehicle with Florida license plates on Interstate Highway 44 in Creek County, Oklahoma, for failing to signal a lane change when entering a toll plaza. Pina was driving; Lajara was the passenger. To avoid traffic, Owen approached the vehicle on the passenger side. In speaking to the occupants he observed an activated radar detector, several cell phones, eye drops, food wrappers, trash and a single key in the ignition. Pina produced his license upon Owen's request. Owen said he intended to issue Pina a written warning for the traffic violation and asked Pina to accompany him to his patrol car. Owen and Pina entered Owen's patrol car approximately two minutes after the stop.

In the patrol car, Owen began to write the warning ticket and engaged with Pina in conversation. Pina asked Owen about the traffic violation and Owen explained it to him. Owen asked Pina about the ownership of the vehicle and the identity of the passenger. Owen also asked Pina about his travel plans. At that point, Pina became "very fidgety, nervous, kind of wrenching his hands. His legs

---

[1]     Our jurisdiction derives from 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

were bouncing. And when we began to talk, he would not make eye contact." (R. Vol. II at 24.) Pina said he was traveling from Florida to Springfield, Missouri, which Owen found odd given the most direct route "would not normally include Interstate 44." (*Id.*) Owen testified Pina "seemed to be making up the story as he went. I even asked him at one time, so you're going to St. Louis? You know, even after he had told me Springfield. And he said, yes, I'm going to St. Louis for two days . . . . " (*Id.* at 25.)

After approximately six to seven minutes, Owen returned to the vehicle to obtain the registration from Lajara. While doing so, he asked Lajara about his travel plans. Lajara told him they had been in Las Vegas, Nevada, for a couple of days, and were bound for Joplin, Missouri. This made more sense to Owen but was inconsistent with Pina's story. Owen returned to the patrol car with the registration and asked Pina about Las Vegas. Owen testified "[it] was very evident to me that [Pina] knew that I knew that they had given conflicting stories. He was real vague on Las Vegas." (*Id.* at 28.) He then called dispatch to determine the status of the vehicle registration and to check Pina's driver's license and criminal history. While he was waiting for the information from dispatch, he deployed his K-9 "[t]o run an air sniff of the vehicle" because he was suspicious of criminal activity. (*Id.* at 30.) Approximately twelve minutes had elapsed since the initial stop.

When Owen and the dog approached the vehicle, Owen instructed Lajara to remain inside the vehicle, roll up the window and turn off the engine. He explained:

> I [did] it for not only officer safety, but [Lajara's] safety and my dog's safety. . . . If [my dog] is in the odor of narcotics, he would jump in [the window]. So I could not let the window stay down and take a chance on my dog jumping in, who's an aggressive dog, and either biting or doing something to the passenger. The reason . . . [to] turn the vehicle off, [is] not only for my safety . . . I'm standing outside there with no protection and a dog leash in my hand[,] [but] [i]f [the passenger] jumps over into the driver's side, I don't want him throwing it in gear and running over me or leaving the scene.

(*Id.* at 50-51.)

The dog alerted to the presence of narcotics after approximately two minutes. Owen performed a pat-down search of Pina and Lajara and moved them to a grassy area away from traffic. A subsequent search of the vehicle revealed a false compartment built into the floorboard behind the driver's seat. Inside the compartment, officers located seven bundles of cocaine with a net weight of 6.9 kilograms.

Pina and Lajara were indicted on one count of possessing five or more kilograms of cocaine with intent to distribute and aiding and abetting the same. Lajara filed a motion to suppress arguing, rather summarily, "[t]he stop and search . . . was illegal." (*Id.* Vol. I at 21.) Pina filed a motion to suppress challenging (1) "the length and scope of his detention after the Trooper initiated the stop" and (2) "the illegal search and seizures." (*Id.* at 38.) Following a

-4-

hearing, the court denied Pina and Lajara's motions. Pina and Lajara then entered into plea agreements with the government pursuant to which they pled guilty to the charges against them and reserved their right to appeal from the denial of their motions to suppress. Pina was sentenced to 120 months imprisonment; Lajara 85 months.

## II.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief." *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) (quotations omitted). To determine whether a traffic stop was reasonable, "we make a dual inquiry, asking first 'whether the officer's action was justified at its inception,' and second 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

Neither Pina nor Lajara dispute the legality of the initial stop; instead they challenge their subsequent detention. They contend:

> After determining that the alleged traffic infraction only merited
> a traffic warning to the driver . . . the officer delayed . . . while
> he embarked on a line of questioning unrelated to the purpose of
> the original stop, ordered Mr. Lajara to turn off the engine, roll up

the windows and . . . then deployed his canine to search for contraband . . . .

(Lajara's Opening Br. at 9.)[1] The district court concluded Owen did not unreasonably prolong the detention.[2]

> In reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous. The ultimate determination of reasonableness under the Fourth Amendment, however, is a question of law which we review de novo. We view the evidence in the light most favorable to the district court's determination.

*Bradford*, 423 F.3d at 1156 (citations omitted).

"It is well-established that a law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." *Id.* (quotations omitted). An officer may also ask questions related or unrelated to the initial purpose of the stop so long as "those questions . . . do not unreasonably extend the amount of time that the subject is detained." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) (quotations omitted). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

---

[1] Pina makes a similar argument. (*See* Pina's Opening Br. at 10.)

[2] Alternatively, the court concluded the detention was justified because Owen had reasonable suspicion of criminal activity.

Lajara acknowledges Owen "never actually issued the warning" to Pina. (Lajara's Opening Br. at 10.) He contends, however, that Owen "unreasonably prolonged [his] seizure beyond the time required to complete [the] mission [of issuing a warning ticket]." (*Id.* at 11.) Viewing the facts in the light most favorable to the government, we see no indication of unreasonable delay.

After he obtained Pina's driver's license, Owen asked Pina to accompany him to his patrol vehicle so he could complete the written warning. He began to write the warning ticket and conversed with Pina about the traffic violation, ownership of the vehicle, and Pina's travel plans. This conversation took between four and five minutes. Owen then returned to the vehicle to obtain the registration papers and, while doing so, asked Lajara about his travel plans. He contacted dispatch upon returning to the patrol vehicle and deployed his dog while awaiting the information from dispatch–approximately twelve minutes after the initial stop.[3]

We upheld a detention of similar length and scope in *United States v. Patterson*, 472 F.3d 767 (10th Cir. 2006). In that case, a police officer stopped a van for traveling above the posted speed limit. *Id.* at 772. The officer asked the driver of the van, Patterson, to accompany him to his patrol car while the passenger remained in the back seat of the van. In the patrol car, the officer

---

[3]      There is no evidence Owen asked dispatch to delay providing the requested information.

informed Patterson he intended to issue him a warning citation. He asked

Patterson for proof of his registration and insurance and when Patterson stated

those documents were in the van, he returned to the van. The officer questioned

both Patterson and the passenger about their travel plans and discussed "a wide

variety of topics" with Patterson. *Id.* Approximately six minutes after the initial

stop, the officer radioed to dispatch for a records check. Another officer then

arrived on the scene with a drug detection dog who walked around the stopped

van. After receiving a response from dispatch, the first officer completed the

warning citation. At the same time Patterson was signing the citation, the dog

alerted to the presence of narcotics. The dog alerted two more times and a search

of the van ultimately revealed a hidden compartment containing 67 pounds of

cocaine. *Id.* at 773.

On appeal, Patterson challenged the district court's denial of his motion to

suppress. We considered "whether the detention *prior to the alert* was

unreasonable" applying "common sense and ordinary human experience."

*Id.* at 776 (quotations omitted). We noted Patterson was detained for a period of

13 minutes and 27 seconds prior to the alert. *Id.* We held the activities

undertaken by the officers "clearly . . . fit reasonably within the scope of the

detention." *Id.* at 777. And we rejected Patterson's argument that "[the] timeline

indicates that [the first officer] was dragging his feet throughout the stop in order

to give [the second officer] time to arrive and run [his dog] around the van." *Id.*

We explained: "Viewing the evidence in the light most favorable to the government . . . it is clear that [the first officer] acted reasonably." *Id.*

Pina and Lajara contend a different result is warranted here because Owen asked Lajara to close the window and turn off the vehicle before he walked his dog around the vehicle. We disagree. While we recognize the possibility an officer's instruction to close a window or turn off an engine could be seen as an unreasonable exercise of dominion and control in some circumstances,[4] we agree with the district court that these requests were reasonable here. As the court explained: "There's no reason for that car to be running while this search is going on with a passenger inside the car. It would be very simple for the passenger to move over and take off[.]" (R. Vol. II at 74.) And Owen testified he instructed Lajara to close the window in order to prevent his dog–an aggressive dog–from jumping in the window and potentially causing harm to Lajara.[5] Considering Owen's instructions in the light of "common sense and ordinary human experience," *United States v. Sharpe*, 470 U.S. 675, 685 (1985), they did

[4] This would be particularly relevant if Pina and Lajara's consent were at issue. We have recognized that consent must be given without implied or express duress or coercion, *see United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir. 1996), but consent is not at issue here.

[5] Moreover, had the dog jumped into the window, the search may have violated Pina and Lajara's privacy interest. *See United States v. Winningham*, 140 F.3d 1328, 1330-31 (10th Cir. 1998) (affirming the district court's grant of a motion to suppress where officers opened a vehicle door through which a dog jumped during a canine sniff).

not unreasonably or unnecessarily prolong the detention. Like the detention at issue in *Patterson*, Pina and Lajara's detention was reasonable in scope and duration.[6]

We **AFFIRM** the district court's denial of the motions to suppress.

Entered for the Court


Terrence L. O'Brien
Circuit Judge

---

[6]      We need not address the government's alternative argument that Owen's questioning of Pina and Lajara did not violate the Fourth Amendment because he had reasonable suspicion of criminal activity. *See Bradford*, 423 F.3d at 1156-57 ("After the purpose of the traffic stop is completed, further detention for purposes of questioning unrelated to the initial stop is impermissible unless: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter.").