**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**March 30, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

YUSEF CASANOVA,

    Defendant - Appellant.

No. 20-2159
(D.C. No. 1:16-CR-02917-JAP-1)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **BALDOCK**, and **PHILLIPS**, Circuit Judges.
_____

A federal jury convicted Yusef Casanova of possession of methamphetamine with intent to distribute, possession of a firearm by a prior felon, and possession of a sawed-off rifle. The district court sentenced him to 120 months in prison. Casanova appeals his convictions and sentence, claiming: (1) he was arrested because of race-based selective enforcement; (2) his trial attorney rendered ineffective assistance by (A) operating under a conflict of interest, and (B) pursuing

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

the selective-enforcement claim and an entrapment defense; and (3) he was entitled to a two-level downward departure for acceptance of responsibility. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

I

*A. Factual Background*

In 2016, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) conducted a "surge" operation in Albuquerque, New Mexico. R., vol. 4 at 267. The operation was part of an on-going nationwide initiative to reduce violent crime by targeting gun and drug trafficking. In a typical surge operation, undercover ATF agents move into a city and focus on a single high-crime area for 120 days. They work with confidential informants (CIs) to identify potential suspects from whom ATF agents attempt to buy guns and/or drugs. Transactions are recorded on video, but sellers are not arrested until the end of the operation to maintain its secrecy.

In the Albuquerque operation, local law enforcement directed the ATF to a high crime area in the southeast part of the city known as the International District. ATF agents moved into that area using five male CIs from other states; three CIs were Black, two were Hispanic. During the operation, one of the CIs learned that someone named "Casanova" could get both firearms and methamphetamine. *Id.* at 689. The CI obtained Casanova's phone number from which the lead ATF agent determined Casanova had multiple prior felony convictions, making him "a good target," *id.* at 690. The lead ATF agent instructed the CI to contact Casanova, who

said that for a $50 "finder's fee" he could sell the CI a sawed-off rifle for $100 and two ounces of methamphetamine for $1,200. *Id.* at 695. They agreed to meet.

Casanova met the CI and the lead ATF agent in a parking lot, where he told them someone else would bring the methamphetamine and he could get only one ounce. Casanova retrieved a white plastic bag from the back seat of his car. Inside the bag was what appeared to be the stock of a firearm. The lead ATF agent motioned for Casanova to get into his truck, and as they walked, Casanova handed him a loaded magazine. Inside the truck, Casanova removed a rifle from the plastic bag and handed it to the lead ATF agent, who noticed it was shorter than 26 inches as required by federal law. The lead ATF agent asked, "Hey, did you cut this?" *Id.* at 709 (internal quotation marks omitted). Casanova replied, "No, it got cut." *Id.* (internal quotation marks omitted). The lead ATF agent paid Casanova with a $100 bill for the rifle and the loaded magazine.

Casanova returned to his car, and another vehicle entered the parking lot. A white male exited the vehicle holding a bag of methamphetamine. He got into Casanova's car, and afterwards, Casanova approached the lead ATF agent with the bag of methamphetamine. The lead ATF agent weighed the methamphetamine and determined it weighed one-half gram less than one ounce. Casanova "said that he would make up the difference . . . on a later transaction." *Id.* at 353. The lead ATF agent paid Casanova $600 for the methamphetamine and $50 for the finder's fee, and Casanova left. Later that night, Casanova called the lead ATF agent to say he had obtained a second ounce of methamphetamine, but they did not conduct another buy.

3

Casanova was indicted for possession of methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1), (b)(1)(B), being a felon in possession of a firearm and ammunition, 18 U.S.C. § 922(g)(1), and possession of an unregistered, sawed-off rifle, 26 U.S.C. §§ 5861(d), 5871.  The ATF attempted to identify Casanova's methamphetamine supplier, but they were unable to do so.  Neither could they locate Casanova because he had been taken into state custody on other drug charges.  When the ATF eventually arrested Casanova, agents sought to question him to determine the identity of his supplier, but they could not conduct an interview because he was represented by counsel.

### B.  Procedural History

Before trial, Casanova moved for discovery about the Albuquerque operation, alleging he was arrested because of racially discriminatory selective-enforcement practices.  The district court held a hearing and granted discovery.  Casanova then moved to dismiss the indictment, claiming the ATF acted with discriminatory intent in conducting the operation, which had the discriminatory effect of arresting a disproportionate percentage of African-Americans.  The district court held another hearing and denied the motion to dismiss, ruling that Casanova failed to demonstrate either a discriminatory purpose or a discriminatory effect.  *See* Suppl. R., vol. 1 at 82-88.

At trial, Casanova put on an entrapment defense based on the theory that he was suffering from drug addiction and was lured into selling the drugs and rifle.  He testified in his own defense and identified the white male who supplied the

methamphetamine as John Bowker.  The jury rejected his defense and convicted him on all three counts.

After the trial, the government confirmed Bowker was Casanova's supplier. Consequently, Bowker was indicted for possession of methamphetamine with intent to distribute.  The government also learned that Casanova's trial attorney, Brian Pori, had concurrently represented Bowker on unrelated charges for conspiracy, bank fraud, aggravated identity theft, and possession of stolen mail.  *See* Indictment, *United States v. Bowker*, No. 1:18-cr-2664-JCH (D.N.M. Aug. 15, 2018), ECF No. 2. The government notified the district court of the potential conflict, and after another hearing the district court concluded there was no conflict of interest.

Before sentencing, Pori withdrew from the case, and Casanova moved for a new trial based on the alleged conflict of interest.  The district court held another hearing, at which Pori denied that there was a conflict of interest, although he believed he had rendered ineffective assistance by pursuing the selective-enforcement and entrapment theories.  Given Pori's testimony, Casanova added a claim alleging ineffective assistance of counsel.  The district court rejected his claims and denied the motion for a new trial.

At sentencing, the district court denied a two-level downward adjustment for acceptance of responsibility under U.S. Sentencing Guidelines Manual (U.S.S.G.) § 3E1.1 (U.S. Sentencing Commission 2018).  Based on a total offense level of 28 and a criminal history category of VI, the district court determined Casanova's advisory guideline range was 140 to 175 months in prison on the methamphetamine-

dealing count and 120 months on each of the two firearm counts.  The district court sentenced Casanova to concurrent terms of 120 months on all three counts.

II

On appeal, Casanova contends:  (1) he was arrested due to race-based selective enforcement of the law; (2) his trial attorney rendered ineffective assistance by (A) operating under a conflict of interest, and (B) pursuing selective-enforcement and entrapment theories; and (3) he was entitled to a two-level downward adjustment under § 3E1.1.  We consider these issues in turn.[1]

*A.  Selective Enforcement*

"The Constitution prohibits selective enforcement of the law based on considerations such as race."  *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1263 (10th Cir. 2006) (internal quotation marks omitted).  A selective-prosecution claim, which has essentially the same elements as a selective-enforcement claim, *see id.* at 1264, "is not a defense on the merits to a criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution," *United States v. Armstrong*, 517 U.S. 456, 463 (1996).  "The requirements for a claim of racially selective law enforcement draw on . . . ordinary equal protection standards."  *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157,

---

[1] Casanova also argued in his opening brief that his conviction for being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1) should be vacated pursuant to *Rehaif v. United States*, 139 S. Ct. 2191 (2019).  In his reply brief, however, Casanova concedes that after he filed his opening brief, the Supreme Court foreclosed his *Rehaif* claim in *Greer v. United States*, 141 S. Ct. 2090 (2021).

1168 (10th Cir. 2003) (internal quotation marks omitted).  The defendant "must demonstrate that the [government's] actions had a discriminatory effect and were motivated by a discriminatory purpose." *Id.*  To show a discriminatory purpose, the defendant must show "that discriminatory intent was a motivating factor in the decision to enforce the criminal law against the defendant." *Alcaraz-Arellano*, 441 F.3d at 1264 (internal quotation marks omitted).  To show a discriminatory effect, he "must make a credible showing that a similarly-situated individual of another race could have been, but was not, . . . arrested for the offense for which the defendant was . . . arrested." *Id.* (ellipses and internal quotation marks omitted).

Absent evidence of overt discrimination, most selective-enforcement claims are "based on statistical comparisons between the number of black or other minority Americans . . . arrested and their percentage in some measure of the relevant population." *Marshall*, 345 F.3d at 1168.  Statistical evidence must provide "a reliable measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population." *Id.* (citations omitted).  But statistical evidence alone rarely suffices to show discriminatory purpose because "to prevail . . . , [a claimant] must prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292-93 & n.12 (1987).  The standard of proof is "demanding." *Alcaraz-Arellano*, 441 F.3d at 1264 (internal quotation marks omitted).  And we

review the district court's denial of the motion to dismiss the indictment only for an abuse of discretion. *Id.* at 1265.

Casanova relies primarily on statistical evidence to show a discriminatory purpose. He cites a report from the United States Sentencing Commission indicating that in the District of New Mexico, African-Americans comprise approximately 5.4% of defendants in drug-trafficking cases and 5.9% of defendants in firearms cases. *See* R., vol. 1 at 98. He also relies on Census Bureau statistics indicating that only 3.4% of the population in Bernalillo County, New Mexico, is African-American, *see id.* at 251-52, but argues that approximately 25.9% of those charged in the Albuquerque operation were African-American. Additionally, he notes that most of the CIs in the Albuquerque operation were African-American, and he points out that the ATF has a history of targeting minority neighborhoods. Finally, he contends that despite being aware of concepts like implicit racial bias, the ATF failed to develop any policies or training to counter the effects of implicit bias.

Casanova fails to show a discriminatory purpose. The ATF's awareness of implicit bias or the potential for adverse consequences for African-Americans is not enough to show a discriminatory purpose. "Discriminatory purpose implies more than intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 610 (1985) (brackets, ellipses, and internal quotation marks omitted).

Further, Casanova's statistical evidence expands the geographic area too broadly. While Casanova relies on data from Bernalillo County and the entire state of New Mexico, the Albuquerque operation focused on particular high-crime areas of the city. And the Bernalillo County demographics say nothing about the incidence of crime there among racial groups. Moreover, the statistical evidence must show a "stark" pattern of discrimination. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also McCleskey*, 481 U.S. at 293 n.12 (explaining that "a statistical pattern of discriminatory impact [has] demonstrated a constitutional violation" only in "rare cases," such as where "395 of 400 black voters" were excluded "without excluding a single white voter" or where permits were granted to "all but one of the white applicants . . . but none of the over 200 Chinese applicants"). Casanova's evidence does not show such a stark pattern.

Neither does Casanova's other evidence satisfy the standard of proof. Three of the five CIs were Black, but the record confirms that they were selected because they had performed well in previous operations, not because they were intended to have a racial impact. *See* R., vol. 4 at 282. Casanova also faults the ATF for targeting a predominately minority neighborhood, but again, the evidence confirms that the ATF targeted the International District not because of a discriminatory purpose but because the ATF was directed to that area due its high crime by numerous local law enforcement agencies, including the Albuquerque Police Department, the local sheriff's office, the district attorney's office, the state police, the United States Attorney's Office, the U.S. Marshals Service, the local ATF division, and the Drug

Enforcement Administration. *See id.* at 106, 283-84. This area was known as the

"War Zone," *id.* at 283, 622, and the lead ATF agent specifically testified that racial

considerations played no part in the decision to target that area, *id.* at 107. This

evidence fails to show a discriminatory purpose, and thus, Casanova cannot prevail

on his selective-enforcement claim. We therefore need not consider whether he can

establish a discriminatory effect. *See Alcaraz-Arellano*, 441 F.3d at 1266. The

district court did not abuse its discretion in denying the motion to dismiss.[2]

### B. Ineffective Assistance

"We review the district court's denial of a motion for a new trial for abuse of

discretion." *United States v. Crowe*, 735 F.3d 1229, 1244 (10th Cir. 2013). "A

district court abuses its discretion if its adjudication of a claim is based upon an error

of law or a clearly erroneous finding of fact." *Id.*

"Generally, ineffective assistance of counsel claims should be brought in

collateral proceedings, not on direct appeal." *United States v. Gallegos*, 108 F.3d

---

[2] Because we do not consider whether Casanova can establish a discriminatory effect, we need not evaluate his argument that Bowker was a similarly situated individual of a different race who could have been, but was not, arrested. However, to the extent Casanova infers a discriminatory purpose because Bowker was "not pursued with all reasonable means," Aplt. Br. at 28, the record refutes his contention. The lead ATF agent described the efforts to identify Bowker, including running the license plate of the vehicle he was driving, which was registered to someone else, and investigating the registered owner. The lead ATF agent explained he did not immediately arrest Bowker for the same reason he did not immediately arrest Casanova or interview the registered owner of the vehicle: doing so would have compromised the secrecy of the operation. But once the operation ended and Casanova identified Bowker as his supplier, Bowker was indicted and later pleaded guilty to possession of methamphetamine with intent to distribute. *See United States v. Bowker*, No. 1:19-cr-01988-JCH (D.N.M. Nov. 25, 2020), ECF. No. 30.

1272, 1279 (10th Cir. 1997). "Such claims brought on direct appeal are presumptively dismissible, and virtually all will be dismissed." *United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995). In rare cases, however, "we have considered ineffective assistance of counsel claims on direct appeal where such claims were adequately developed by the district court prior to appeal." *Gallegos*, 108 F.3d 1280; *see, e.g., United States v. Rodriguez-Rivera*, 518 F.3d 1208, 1216 (10th Cir. 2008) (considering ineffective-assistance-of-counsel claim on direct appeal where the claim was raised and ruled upon by the district court). The district court held evidentiary hearings and issued a thorough decision, and therefore, we consider the claims.

To prevail on an ineffective-assistance-of-counsel claim, a "defendant must show that his counsel's performance 'fell below an objective standard of reasonableness' and that the deficient performance resulted in prejudice." *Rodriguez-Rivera*, 518 F.3d at 1216 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). "[W]e accept the district court's underlying factual findings unless clearly erroneous, and we review de novo whether counsel's performance was legally deficient and whether any deficiencies prejudiced the defendant." *Id.* (internal quotation marks omitted).

### 1. Defense Counsel Did Not Operate Under a Conflict of Interest

"Effective assistance of counsel includes the right to representation that is free from conflicts of interest." *Wallace v. Ward*, 191 F.3d 1235, 1245 (10th Cir. 1999). But to constitute an actual conflict of interest, the conflict must have "affected

11

counsel's performance—as opposed to a mere theoretical division of loyalties."
*Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (italics omitted). "An actual conflict of interest exists only if counsel was forced to make choices advancing interests to the detriment of his client." *Workman v. Mullin*, 342 F.3d 1100, 1107 (10th Cir. 2003) (ellipsis and internal quotation marks omitted).

Casanova asserts there was an actual conflict because Pori concurrently represented Bowker for a four-month period between August 15 and December 27, 2018. The district court concluded there was no actual conflict. We agree.

At an evidentiary hearing on July 10, 2019—which was after the trial but before sentencing—Pori and Casanova both denied there was any conflict. Pori testified that he did not know Bowker was Casanova's supplier when he represented Bowker, and Casanova did not identify Bowker as his supplier until sometime within two weeks before trial. Casanova corroborated that testimony and confirmed he did not tell Pori that Bowker was his supplier until about a week before the trial. Based on their representations, the district court found that there was no conflict.

After Pori withdrew from the case, however, Casanova sought a new trial based on the alleged conflict. At a second hearing on July 20, 2020, Pori insisted there was no actual conflict and "[t]here was no chance [he] was going to call Mr. Bowker [to testify]." R., vol. 4 at 1255. Pori acknowledged that Bowker might have offered some favorable testimony, including that Casanova did not set the price for the drugs or exercise control over them, but he explained those facts would have been apparent to the jury from audio recordings of telephone calls played to the jury.

12

He also emphasized that "[a]t no point . . . did I have to choose between helping one client at the expense of another.  That did not happen."  *Id.* at 1270.

The district court continued the hearing until August 12, 2020, at which time Stephanie Porter testified that she worked as a paralegal on Casanova's motion to dismiss and in preparation for sentencing.  She acknowledged that she did not know when Casanova told Pori that Bowker was his supplier.  But she explained that she met with Casanova after the first evidentiary hearing and that during their meeting he indicated to her that he told Pori about Bowker months before the trial.  She testified:

> Mr. Casanova told me that, in fact, they had . . . a discussion months prior at the jail, where Mr. Casanova had said something to Mr. Pori to the effect of, I think you know John.  Because John—John Bowker was in [jail] with Yusef Casanova.  They were inmates together.  And I assume that they started talking and realized they had the same attorney.
>
> And so Yusef expressed to me that months prior to trial, [Pori] had gone to visit him and Yusef had said, I think you know—I think you know John.
>
> And that Mr. Pori had expressed agreement with that.  Like, yeah, I knew this was the same guy.

R., vol. 4 at 1467-68.

After hearing Porter's testimony, the district court determined again that there was no actual conflict of interest.  Although the court acknowledged that Porter's testimony tended to contradict Pori's testimony, the district court observed that Porter conceded she did not know when Casanova revealed Bowker's identity to Pori.  By contrast, the district court noted that Pori had consistently maintained that he did not know Bowker was Casanova's supplier until shortly before trial, and both Pori

13

and Casanova had previously testified that Casanova did not reveal Bowker's identity until within two weeks before the trial. Consequently, the district court credited Pori and Casanova's testimony over Porter's and concluded there was no actual conflict.

On appeal, Casanova urges us to reweigh the evidence, asserting that "Pori's testimony about when he learned of Mr. Bowker's identity is questionable," Aplt. Br. at 12. But he offers nothing to suggest the district court clearly erred in finding that Casanova did not disclose Bowker's identity until just before the trial. And we decline to reweigh the evidence or second-guess the district court's credibility assessments. *See United States v. Campbell*, 603 F.3d 1218, 1225 (10th Cir. 2010) ("The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court." (internal quotation marks omitted)).

Casanova also contends that Pori could have pursued alternative defense strategies. *See United States v. Bowie*, 892 F.2d 1494, 1500 (10th Cir. 1990) ("[D]efense counsel's performance was adversely affected by an actual conflict of interest if a specific and seemingly valid or genuine alternative strategy or tactic was available to defense counsel, but it was inherently in conflict with his duties to others or to his own personal interests."). Yet nothing in the record suggests Pori abandoned valid alternative strategies because he was torn between divergent interests. Regarding Bowker, Pori specifically testified that "[a]t no point in this case did I have to choose between helping one client at the expense of another." R., vol. 4 at 1270. Casanova asserts that Pori might have called Bowker to testify that

14

"Casanova had no proprietary interest in the drugs, did not set the price for the drugs, did not weigh the drugs and did not have dominion or control over the drugs." Aplt. Br. at 33. But Pori testified that "[t]here was no chance" he would have called Bowker because such testimony would have incriminated Bowker as Casanova's supplier, and thus, Bowker would have invoked his Fifth Amendment right against self-incrimination. R., vol. 4 at 1337. Pori also explained that this information was already available and apparent to the jury from other evidence, including audio recordings. And he recognized that Bowker might have denied any involvement, which would have put Casanova "in a considerably disadvantaged state." *Id.* at 1282.

Still, Casanova argues that Pori could have cooperated with the government for a more lenient plea deal. He asserts Pori might have offered to divulge Bowker's identity rather than pursue the selective-enforcement claim and proceed to trial. But the district court found that Pori did not know Bowker's identity until just before the trial, so he could not have divulged it to the government earlier in lieu of pursuing the selective-enforcement claim. As Pori explained, he did not recognize Bowker from any of the video or audio recordings and he did not know the identity of Casanova's supplier at the time he pursued the motion for selective enforcement. *Id.* at 1264-65. He also explained that Casanova was determined to go to trial, and it was not Pori's practice to offer to cooperate with the government. He emphasized that he saw no strategic benefit in that approach, and he added that he had no indications from the government that they would have offered Casanova any concessions even if Casanova had divulged that Bowker was his supplier, *see id.* at

15

1297.  The district court credited Pori's testimony, and although Casanova argues that Pori conceded his concurrent representation of Bowker might have created the appearance of impropriety, that does not show it affected his performance.

Casanova also asserts Pori was conflicted by his own personal self-interests. He cites Pori's professed anger with the Albuquerque operation and argues that rather than speak to the media about the selective-enforcement claim, Pori should have cooperated with the government for a plea deal.  But Casanova did not want a plea deal, and Pori sincerely believed there was selective enforcement of the laws. Casanova also contends that Pori's own history of drug addiction worked to his detriment, apparently because Pori pursued the entrapment defense on the theory that Casanova was lured into crime because he was suffering from drug addiction.  Again, however, Casanova insisted on going to trial, and Pori testified that he thought entrapment was the only valid, available defense they had.  These circumstances do not demonstrate an actual conflict of interest.

*2.  Defense Counsel's Performance Was Not Objectively Unreasonable*

Casanova also contends Pori rendered ineffective assistance by pursuing the selective-enforcement and entrapment theories.  During the July 20, 2020, evidentiary hearing, Pori testified that he thought he rendered ineffective assistance by pursuing the selective-enforcement claim; he acknowledged he had been driven by his personal feelings about the Albuquerque operation and his belief that the ATF's selective enforcement of the law led to Casanova's arrest.  He also testified that he was ineffective in putting on the entrapment defense because it required the jury to

16

assume Casanova was not predisposed to criminality despite his multiple prior felony convictions.

The district court concluded that Pori lamented pursuing the selective-enforcement and entrapment theories in hindsight, but he had sound reasons for pursuing them when he did, and his performance in doing so was not objectively unreasonable. We agree.

"It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable." *Strickland*, 466 U.S. at 689. To help "eliminate the distorting effects of hindsight," we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* We presume that counsel "acted in an objectively reasonable manner and that his challenged conduct *might* have been part of a sound trial strategy." *Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002). If counsel's decision was "an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes virtually unchallengeable." *Id.* (internal quotation marks omitted). But these presumptions "should not obscure the overriding, and ultimately determinative, inquiry courts must make under *Strickland*'s deficient performance prong: whether, after considering all the circumstances, counsel's performance fell below an objective standard of reasonableness." *Id.* at 1047 (internal quotation marks omitted).

17

Pori testified that he pursued the selective-enforcement claim because he held a bona fide belief that Casanova was arrested due to selective enforcement of the law. He explained that, in his experience, there are racial inequities in criminal sentencing and he felt compelled to challenge what he perceived as the ATF's unconstitutional law enforcement action. *See* R., vol. 4 at 1311-14. He testified that the standard for proving a selective-enforcement claim is virtually "insurmountable," and he thought this case might be a vehicle for changing the standard. *Id.* at 1310. Pori's testimony demonstrates that his decision to bring the selective-enforcement claim was an informed strategic choice. Although Casanova complains that Pori was ineffective in giving media interviews while pursuing the selective-enforcement claim rather than seeking to cooperate with the government, we have already explained that cooperating with the government was not a viable option because Pori did not know Bowker's identity at the time he litigated the selective-enforcement claim and Casanova was determined to go to trial. These circumstances do not suggest that bringing the selective-enforcement claim, which Casanova's new counsel continues to pursue on appeal, was objectively unreasonable.

As for the entrapment defense, Pori explained that Casanova "wanted a trial" and "would not plead to anything," so he presented the only defense he thought was available—entrapment. *Id.* at 1291-92. Pori explained that he was also sensitive to drug addiction because of his own history with addiction and he "felt confident that at least one juror would find that offering a drug addict drugs to broker a drug deal would be a form of entrapment." *Id.* at 1267. Although in hindsight Pori regretted

18

his decision after it proved unsuccessful, the entrapment defense was an informed strategic choice. We cannot say pursuing it was objectively unreasonable. Casanova was not entitled to a new trial based on his ineffective-assistance claims.

## C. Downward Adjustment

At sentencing, the district court denied Casanova's request for a downward adjustment under U.S.S.G. § 3E1.1. That section provides for a two-level reduction to a defendant's offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." *Id.* § 3E1.1(a). Casanova contends he was entitled to the reduction because he never denied his factual guilt for his offenses. "Whether a defendant is entitled to a reduction in offense level under § 3E1.1(a) is a question of fact that we review for clear error." *United States v. Collins*, 511 F.3d 1276, 1279 (10th Cir. 2008). It is Casanova's burden to show by a preponderance of the evidence that he was entitled to the reduction. *See id.*

The commentary to § 3E1.1 states:

This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make . . . a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1, cmt. n.2.

19

Casanova contends his is a "rare" case because he went to trial to assert an entrapment defense, not deny guilt. He contends that his pre-trial participation in drug treatment, coupled with his trial testimony admitting his conduct, clearly demonstrates that he accepted responsibility.

Casanova is partly correct. "[A] sentencing court may apply an acceptance-of-responsibility reduction to a defendant who asserts the entrapment defense." *United States v. Garcia*, 182 F.3d 1165, 1173 (10th Cir. 1999). However, "that does not mean that the simple assertion of the entrapment defense coupled with acknowledgement of the underlying criminal activity automatically entitles a defendant to a two-point acceptance[-]of[-]responsibility reduction." *Id.* "A defendant will [still] need to evidence acceptance of responsibility, primarily through pre-trial statements and conduct, before an acceptance[-]of[-]responsibility reduction would be warranted." *Id.* at 1174. When evaluating the propriety of a reduction, courts may consider such factors as a defendant's "voluntary termination or withdrawal from criminal conduct," "voluntary surrender to authorities promptly after commission of the offense," "voluntary assistance to authorities in the recovery of the fruits or instrumentalities of the offense," "post-offense rehabilitative efforts," and "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. n.1.

Casanova's participation in drug treatment weighs in favor of granting the reduction. But the balance of his conduct does not. There is no evidence he sought to withdraw from the drug and firearm transaction underlying this case; rather, after

20

selling the rifle and less than one full ounce of methamphetamine to the lead ATF agent, Casanova said he would make up the difference on a later transaction. That same night he called the lead ATF agent and said he had obtained a second ounce of methamphetamine. Casanova also did not voluntarily surrender to the authorities; rather, he was arrested by local police on additional drug charges. And when the ATF attempted to interview him to learn the identity of his methamphetamine supplier, he did not assist authorities by identifying Bowker; rather, he waited until trial to disclose Bowker's identity to authorities. Thus, while Casanova contends that he accepted responsibility for his criminality, his pre-trial conduct suggests otherwise. On this record, we cannot say the district court clearly erred in denying the two-level reduction for acceptance of responsibility.

## III

The district court's judgment is affirmed.

Entered for the Court

Gregory A. Phillips
Circuit Judge